IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MICAHN T. CARTER, | ) | No. 40285-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| MARY E. JONES, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

**Rape noun**
**1:** unlawful sexual activity and usually sexual intercourse carried out forcibly or under threat of injury against a person's will or with a person who is beneath a certain age or incapable of valid consent because of mental illness, mental deficiency, intoxication, unconsciousness, or deception.  Compare sexual assault, statutory rape
**2:** an outrageous violation
**3:** an act or instance of robbing or despoiling or carrying away a person by force
**Rape verb**
raped; raping
*transitive verb*
**1:** to commit rape on
**2 a**: despoil
   **b:** archaic: to seize and take away by force
*Rape*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/rape (last visited Dec. 18, 2025).

> [T]he whole reason we're ordained is to exercise power in the name of the church . . . It may be the power that comes from special access to people as pastors do when we assist people with death, with family crisis, with depression, with a variety of other issues . . . What I train our clergy is that our long experiences of church is that that power, beautiful and important, central as it is to us, is also inherently dangerous because it can be misused for purposes other than what it's entrusted to us for.
>
> . . . .
>
> Seduction means essentially any form of pastoring, the end of which is only to deepen the connection between the pastor and the person rather than to lead that person beyond the pastor to Jesus Christ. This would include sexual seduction, drawing people into one's self-pity and a variety of other violations of that fundamental relationship with Jesus. *State v. Wenthe*, 839 N.W.2d 83, 93 (Minn. 2013) (alteration in original) (quoting *State v. Bussmann*, 741 N.W.2d 79, 92-93 (Minn. 2007) (Testimony from Catholic priest on the power of priests over parishioners).

In a case overladen with church life, religious doctrine, a sexual encounter, betrayal, accusations of rape, and a drive for a restored pulpit, we address Washington's recently enacted Uniform Public Expression Protection Act (UPEPA), chapter 4.105 RCW, in the context of a defamation suit. Pastor Micahn Carter, former pastor of a large Yakima church, sues Mary Jones, his former assistant and parishioner, with whom he engaged in sexual intercourse in the church office. He strenuously objects to her later writing a letter to a church pastor and a blog characterizing the encounter as "rape." The superior court refused to dismiss Carter's suit under the early dismissal provisions of the UPEPA because, in part, Carter is not a public figure and a question of fact existed as to whether Jones negligently labeled the encounter "rape." Thus, according to the superior court, Carter presented a prima facie case of defamation.

We reverse and direct dismissal of Micahn Carter's lawsuit. In reversing, we rule that Mary Jones' letter to the pastor enjoyed a privilege, Carter is a limited public figure, Jones' accusation of rape in her blog constituted an opinion, and Jones did not publish either of her communications with actual malice.

FACTS

Pastor Micahn Carter's defamation suit against former parishioner and assistant Mary Jones arises from sexual intercourse between the two in the church office on April 29, 2019. Carter sues because of two communications by Jones: a July 13, 2021, letter Jones sent to Chris Hodges, pastor of Birmingham's Highland Church; and a July 21, 2021, blog post entitled "Moving Forward." Clerk's Papers (CP) at 24-25. Hereafter we respectively refer to the two communications as the "Hodges letter" and "blog post." Because Mary Jones labels the sexual intercourse as rape and Micahn Carter calls the intercourse consensual sex, we hereafter refer to the intercourse with the neutral term of sexual encounter or encounter.

We review the superior court's denial of defendant Mary Jones' motion to dismiss, motion for summary judgment, and motion for relief under the UPEPA. Despite the superior court proceeding not being complete, RCW 4.105.080, a provision of the UPEPA, allows immediate appellate review of the denial of a motion to dismiss under the act. We take the facts from deposition testimony and summary judgment declarations. We generally employ the summary judgment standard and glean the facts in a glow

favorable to the plaintiff and the nonmoving party, Micahn Carter. Nevertheless, the law instructs us to resolve some of the defamation elements as a matter of law. Thus, we also relate many of the facts as averred by Jones and her witnesses. In the end, however, our analysis and the conclusions we draw would not matter regardless of whether we weigh facts or treat Carter's version of the facts as verities.

We introduce the dramatis personae. Plaintiff Micahn Carter formerly served as lead pastor of the now-defunct Together Church, in Yakima. Together Church was part of a larger organization entitled the Association of Related Churches (ARC) that focused on evangelistic efforts and planting new churches. Micahn's wife, April Carter, served as the executive pastor and oversaw personnel of the church. Because Micahn Carter is the sole plaintiff, we reference only him when we employ his surname, Carter.

Defendant Mary Jones, a member of the congregation for seven years, regarded the Carters as parental figures. In 2018, Michan and April Carter hired Jones to work as Micahn's assistant. Together Church Pastor Kierstin Platt oversaw the church's children's ministry, and Jones rented a room in Platt's residence during the winter and spring of 2019. Christina Vickers, a friend of Mary Jones, was the Together Church's pastor for community outreach. The Together Church regularly conducted a weekly youth ministry group for girls in Vickers' residence. Kierstin Platt and Christina Vickers were both licensed pastors and held themselves out as pastors.

Pastor Kevin Gerald served as a board member of Together Church. Pastor Chris Hodges served as lead pastor of the Church of the Highland in Birmingham, Alabama. Carter considered Dino Rizzo to be his personal pastor. Rizzo, Gerald, and Hodges, in addition to Carter, pastored churches belonging to ARC. Pastors Platt and Vickers signed declarations to support Micahn Carter. Pastor Kevin Gerard signed a declaration supporting Mary Jones' motion.

According to Mary Jones, the Together Church encouraged parishioners to seek spiritual guidance from church leadership. Jones believed conversations with church leaders would be confidential, although she did not identify any written or oral statements that promised confidentiality. Jones included pastors Christina Vickers and Kierstin Platt within church leadership.

According to Mary Jones, she often sought spiritual guidance from Christina Vickers, ten years older than Jones, in Vickers' role as pastor. Jones trusted and learned from Vickers. Vickers counseled Jones on personal and familial issues as Jones continued to develop her relationship with God. Jones believed Vickers would not disclose their conversations. Jones did not speak openly to others about the subjects with which she spoke with Vickers.

Christina Vickers asserts that she did not provide spiritual guidance to anyone not under her leadership unless initiated through the church. We assume that Mary Jones did not serve under Vickers' leadership. According to Vickers, her sole role as a pastor with

Together Church was marrying couples and burying the deceased. Vickers avers that neither the Together Church nor the tenets of its faith required any sort of confession. Confessional conversations never occurred.

Christina Vickers insisted that, while Mary Jones often shared secrets and struggles, Vickers did not offer Jones spiritual guidance. If Jones had sought spiritual guidance or counseling from Vickers, Vickers would have referred Jones to Jones' personal pastor. Vickers does not identify any personal pastor of Jones.

Micahn Carter, April Carter, and Mary Jones shared their respective locations with Pastor Kierstin Platt via the Life 360 app. Platt monitored the locations of the three frequently. According to Platt, whenever Jones knew Carter headed to the church, Jones would drive there. Presumably then Carter shared his location with Jones through the same application. Platt also noted that Jones and Carter exchanged text messages after hours. Apparently, Platt gained privy to the messages, although she does not indicate how. Platt testified about the messages:

> Sometimes they were flirty and seemed a little out of character for Micahn based on the boundaries I knew he had set up when I was working very closely with him years prior.

CP at 258. Platt did not identify those boundaries. Platt asserted that Carter had previously spoken about his struggles with lust and infidelity before committing his life to Jesus Christ. Platt provided no specific as to the language used by Carter or Jones in their texts.

In her declaration, Pastor Christina Vickers averred that Mary Jones deliberately sought to be in the presence of Micahn Carter. Vickers testified to an occasion when April Carter traveled out of town, and a group of individuals, including Vickers and her husband, dined at a restaurant. Vickers insisted that Jones rubbed Carter's leg with her foot. Jones also rested her head on Carter's shoulder.

According to Pastor Kierstin Platt, a male church member accompanied Micahn Carter when Carter traveled for a speaking engagement. During those trips, Mary Jones, while remaining in Yakima, pestered the church member about amply caring for Carter. On one occasion before February 2019, Jones texted Carter instead: "'I hope Brian is really taking care of you.'" CP at 258. Carter replied: "'I want you.'" CP at 258. Jones reported the texts to Kierstin Platt.

In their respective declarations, pastors Kierstin Platt and Christina Vickers spared no Christian charity concerning the veracity, morality, and sanity of Mary Jones. They referenced her prevarications, sponging off of others, provocative dressing, husband stealing, jealously for Micahn Carter's time, and conniving to gain access to Carter. The trial court redacted portions of the declarations that related Jones' alleged sex life.

In January or February 2019, Mary Jones and Michan Carter engaged in what an outsider might deem an unusual and awkward encounter. Carter remarked to Jones that, if he chose to engage in sex with her, she would not say no. Jones wondered if a long hug she gave Carter a week earlier prompted Carter's comment. Jones responded to

7

Carter's utterance: "I can't confidently say that I would say no." CP at 259. Carter told

Jones that she bore a "spirit of sexuality." CP at 49.

Thereafter and presumably the same day as the enticing encounter between

Michan Carter and Mary Jones, Jones entered Pastor Kierstin Platt's church office. Platt

noticed that Jones had been crying. Jones mentioned that Michan Carter had corrected

her, but she did not wish to mention the circumstances of the correction due to

embarrassment. Jones closed the office door and sat in a chair. Apparently, contrary to

her protestation, Jones wanted to talk about the circumstances. Jones reported that Carter

remarked to her that, if he chose to engage in sex with her, she would not decline. Jones

added that she told Carter he may be right. During Jones' and Platt's conversation, the

two discussed whether Carter's comment sought to correct Jones or whether Carter held

sexual desire for Jones. Pastor Platt asked Jones if Jones was emotionally or physically

attached to Carter. Platt mentioned she developed an emotional attachment to the

magnetic Carter when she began work at the Together Church. Platt read articles that

assisted her in overcoming this attraction. Jones responded that she may have developed

the same attraction. Jones planned to reflect and adjust her emotions.

On the following day, Mary Jones and Pastor Michan Carter broached the subject

of Jones' declining to object to any hypothetical sexual advance. Carter then informed

Jones that she could no longer work as his assistant. Mary Jones reported this additional

conversation to Pastor Kierstin Platt. Platt told Jones that Jones should ask Carter if he

wanted to speak with her again and either Carter's wife or Carter's pastor should be present during this conversation. Platt volunteered to speak to Carter's wife on the subject, if Jones chose not to speak with Carter.

According to Pastor Kierstin Platt, Michan Carter and Mary Jones spoke about sexual advances the following day, which presumably would be two days after Carter posed his hypothetical sexual advance, and the two's frank discussion resolved the tension and difficulty. On Carter's return from a speaking engagement shortly thereafter, Carter informed Jones that he had not been himself lately but, after speaking to church leaders, he had returned to his normal character. The record does not inform us of the nature of that "normal character." Apparently, Jones continued to serve as Carter's assistant, but we are not informed of any conversation during which Carter reinstated Jones to the position of his assistant.

On some unidentified day in March 2019, Mary Jones sat on top of a counter in Micahn Carter's office. Carter opened Jones' legs, the two embraced, and Carter placed his hands down the back of Jones' pants. The record does not inform us whether this activity was part of Carter's "normal character."

April 29, 2019, is the key date in this legal saga. On Monday, April 29, the Together Church hosted a yearly leadership event dubbed the Together School of Leadership (TSL). Before the late afternoon service, Mary Jones walked into Micahn Carter's office to talk. According to Jones, Carter grabbed her in a sexual manner. Jones

9

moved away from Carter. Minutes later the two entered the sanctuary together and sat next to one another for two hours.

According to Mary Jones, as she and Micahn Carter entered the sanctuary at the beginning of the meeting, she knew she needed to quit employment. She experienced a flood of different emotions. She felt sick, angry, and confused. She was heartbroken for the father relationship with Carter that she had lost. She wondered if she bore a "spirit of sexuality," as earlier claimed by Carter. CP at 50.

Micahn Carter relates the events of the late afternoon of April 29 differently. According to Carter, he prepared in his office before the TSL conference, which included the program's alumni and some guest speakers. The conference entailed two services that evening. Mary Jones assisted in the event. Jones walked into Carter's office and spoke to Carter before the first service. Jones gave Carter a hug, during which hug she pressed her chest against Carter's face. As the hug endured, Carter touched Jones' body. Carter gives no detail about the nature of this touching or the location of the touching. After a moment, the two stopped the embrace and touching. According to Carter, both of them recognized the impropriety of their actions. Each asked the other: "'are you good?'" CP at 266.

According to Micahn Carter, as he and Mary Jones entered the sanctuary for the first service, the two "agreed not to act weird." CP at 266. Each apologized to the other. During this first service, Jones sat next to Carter and, according to Carter, Jones tried to

hold his hand.  Carter's declaration does not relate his reaction to the alleged attempt to hold his hand.  According to Carter, after the first service, the two met in the hallway.  Each apologized to the other again.  The two agreed to speak to each other after the second service.  We do not know if the two sat together during the second service.

Mary Jones and Micahn Carter also differ as to the more important happenings after the second of the TSL services.  According to Jones, she lingered somewhere inside the church building when someone approached her and told her that Pastor Carter wanted her to go to her office.  When she entered her office, she expected "crying fits of apologies" she had earlier received after physical contact.  CP at 50.  Instead, Carter aggressively and unstably grabbed her.  Jones first froze.  Then, she waved her hands and pivoted around.  She told Carter: "Please don't do this.  You're gonna regret this."  CP at 50.  Carter turned Jones back around, while Jones placed the bottom of a foot against the door.  Jones glanced at her shoes and noticed a stain on the shoe's suede.  She heard the sound of Carter's belt buckle and thought "it is over."  CP at 50.  After the two engaged in intercourse, Carter sat and asked Jones if she was on birth control.  Carter also asked Jones if she would now act weird around him.  After the sexual encounter, according to Jones, Carter expressed sorrow for cheating on his wife.  Jones, in shock, whispered: "I quit."  CP at 50.  Carter replied that quitting would be stupid.

Micahn Carter testified, in his declaration, that, after the second service, he walked to Mary Jones' office as previously agreed.  We do not know the physical layout of the

11

church offices but assume that Jones, as Carter's assistant, maintained an office adjacent to Carter's office. Jones did not enter her office until later. Jones stood inside her office facing the door, while Carter faced Jones. Both apologized to the other again. Jones hugged Carter. The hug lingered, and Jones pressed her body against Carter's body. Jones positioned herself in front of and blocking the door. The bodily contact rocketed and led to sexual intercourse.

At the beginning of his declaration, Micahn Carter repeatedly denied raping Mary Jones and repetitively claimed Jones consented to the intercourse. When describing the sexual encounter, Carter did not detail anything said by Jones that expressed consent to intercourse. He ended his narration of the physical contact with Jones' positioning herself in front of and blocking a door.

According to Micahn Carter, at the end of the intercourse, Mary Jones hugged Carter and tried to kiss his forehead. Carter did not reciprocate. Conviction settled into Carter's mind, and he commented to Jones that he had wrecked his life. Jones retorted: "no you didn't, you don't have to say anything." Jones added: "this is all my fault." CP at 266. Carter answered that she was not to blame. Instead, he needed to assume accountability. According to Carter, Jones begged him not to mention the tryst to anyone. Jones announced she would leave employment, but he told her she need not leave. The two discussed birth control. Jones disclosed she was not on birth control.

After the encounter, Mary Jones called her mother, Laurie Jones, who retrieved her daughter at a nearby gas station. Jones told her mother that Micahn Carter engaged in sex with her and she did not want it to happen. Laurie urged her daughter to contact the police or go to the hospital, but Jones refused. Jones testified she was frightened to go to police, the hospital, or church staff members. She had trusted Carter and now wondered if she could trust anyone at the church. The church had no formal human resources (HR) department, and April Carter, Micahn's wife, functioned as the supervisor of all staff. Laurie then took Jones to a therapist's home, and the therapist arranged for Jones to see another counselor the following morning.

On April 30, the following day, Michan Carter visited a physician. The physician told Carter what every man wishes to hear after engaging in extramarital sex. The physician diagnosed Carter with a mental-health condition that led him to act "not consistent with his character" and "contributed" to the intercourse with Mary Jones. CP at 97. Perhaps this physician can later describe for us Carter's "normal character." Carter has never identified this physician.

According to Micahn Carter, on April 30, 2019, Mary Jones drove April and him to the airport for a trip to Alabama. While Jones placed the couple's luggage in the trunk, Jones asked Carter if he had told his wife about their tryst. Carter said he had not. According to Carter, Jones' demeanor to the airport was "chipper." CP at 267. Jones' demeanor frustrated Carter because guilt ate him alive. At the airport, Jones hugged

13

April Carter goodbye. Jones went to hug Carter, but he declined an embrace. On Thursday, May 2, 2019, April Carter notified Mary Jones of Jones' termination from employment with the Together Church because of the sexual encounter with Micahn.

On May 2, 2019, Pastor Kierstin Platt came home after work to housemate Mary Jones and Jones' mother Laurie sitting on the residence's couch. According to Platt's declaration, Jones had not been present at the abode much that week in part because of planning a birthday party for the Carters' youngest son. Jones notified Platt that she and Carter had engaged in a sexual encounter three days earlier in her office. Jones also mentioned the physical encounter with Carter in March 2019. Jones told Platt that no corporeal touching had occurred between the two again until the night of April 29. Before that day's TSL church service, Jones walked into Carter's office to talk. Jones reported that Carter grabbed her in a sexual manner. Jones moved from Carter. Minutes later the two entered the sanctuary together and sat next to one another for two hours. When Jones returned to her office after the service, Carter approached her and the two engaged in sexual intercourse.

According to Kierstin Platt, during the May 2 conversation with Mary Jones, Platt asked Jones if she told Micahn Carter "no." Jones reported she did not utter the word "no." CP at 122. But she insisted to Platt that she declaimed: "You're gonna regret this." CP at 146. Jones added that Carter turned Jones around, while Jones placed the bottom

of a foot against the door. After the two engaged in intercourse, Carter sat and asked Jones if she was on birth control.

According to Kierstin Platt, after Mary Jones, on May 2, briefly described the sexual encounter with Carter, Platt and Jones teared. Laurie, Mary Jones' mother, uttered: "he raped her." CP at 260. Jones told her mother to be quiet. Platt asked Jones if Carter had any reason to know that Jones did not wish to engage in sex. Jones answered that she did not push Carter away. Jones added that she only stated: "You're gonna regret this." Platt asked Jones: if you were facing the door, why not open the door and leave the office? Jones replied that she had no answer. Jones notified Platt that April Carter called Jones earlier that day of May 2. April told Jones that Carter had confessed the sexual liaison to her. April fired Jones from her job at the Together Church.

During the May 2 conversation, according to Pastor Kierstin Platt, she, Mary Jones, and Laurie Jones discussed that rape did not fit Micahn Carter's character. Platt's declaration does not read, however, that Jones ever denied that Carter raped her. During the conversation, Jones added that, after the intercourse, she drove her car to a gasoline station, parked the car at the station, vomited, and called her mother. Jones stated she wanted to attend church on Sunday, May 5. Platt advised against attending church. Jones expressed a wish to return to her employment at the Together Church.

15

Later in the week of May 2, Mary Jones' brother and sister, Max and Maggie, appeared at the abode of Kierstin Platt and Jones. Jones' siblings had grown worried because Jones stopped working and ceased communication. According to Platt:

> Before Mary spoke a word Max and Maggie said, "You had sex with Micahn, didn't you?" Mary asked me to tell them what she had told me. With Mary next to me, I told Max and Maggie exactly what Mary told me happened on April 29, 2019. Mary confirmed she had not told Micahn no and had not told him that she didn't want to have sex with him.

CP at 260-61.

On some unidentified date in early May, Micahn Carter informed Pastor Kevin Gerald, a board member of Together Church, and Carter's friend and pastor, Dino Rizzo, of the sexual liaison with Mary Jones. During a meeting with Gerald in Seattle, both Micahn and April Carter stated that Micahn suffered a history of mental lapses and could not remember what had occurred during his sexual encounter with Jones. The record does not disclose whether Carter had no memory whatsoever of the sexual encounter or no memory of the details of the encounter. Carter has never disowned the statement uttered to Pastor Gerald of a failure to remember the sexual liaison.

On May 8, 2019, three of the four board members of the Together Church removed Micahn Carter from President of the Board and relieved him of his duties as pastor. The three board members were April Carter, Kevin Gerald, and Pace Hartfield.

According to Pastor Kierstin Platt, for a month after April 29, Mary Jones and her repeatedly covered what happened during the sexual intercourse. Jones, at no time,

16

claimed rape or asserted that she told Carter "no." CP at 261. After Jones saw a

therapist, Jones told Platt that she wished not to visit the therapist again because the

therapist recommended that Jones press criminal charges against Carter. According to

Platt, Jones related that Jones' aunt and uncle also encouraged her to press charges.

On May 23, 2019, Pastor Kevin Gerald sent Micahn Carter a three-page email

containing a list of questions. We repeat a few of the questions.

> Marriage/Family:
>
> Do you want to stay married? If so, you need to continue counseling.
> . . . .
> Ministry:
>
> Based on the idea that the call of God is irrevocable, do you feel you want to return to a platform ministry of preaching, teaching within the next 1-2 years?
> . . . .
> What do you believe about the will of God for your ministry?
> . . . .
> Go back to Yakima:
>
> What's the time frame when you will both be physically and emotionally ready to pastor and lead the church?
> Is the time frame soon enough that we can continue to keep salary's as a leave of absence? . . . guessing we could do a leave of absence approx[imately] 4 months?
> Where do you want to live in the meantime for 2-3 months?
> Is Yak big enough that you can return without a lingering question on your reputation around the city/ the church?
> Is there a legal issue? If so, how serious is it? Will there be people close to the situation (who know and are angry) who are more likely to stir up a legal issue if you go back to Yak?

> Would you seek to reconcile with Mary? . . . her family? As part of going back. Or would you leave it alone and hope for the best from them?
>
> . . . .
>
> Where is the best place to live to feel safe, loved/be restored/be involved/serve in a church, while preparing yourself for a return to platform ministry?
>
> . . . .
>
> Working on a place for Michan to go "The Center" a place of hope in Edmonds. They do an assessment 888-771-5166
> What did the Dr say? What kind of Meds did he give you?
> Your salary continues . . . although you are not pastors.

CP 269-71. The Together Church never extended the same Christian charity to Mary Jones to offer her work or grant her a salary until she could return to work.

The record does not indicate whether Micahn Carter responded to Pastor Kevin Gerald's questions. According to Pastor Gerald, he subsequently met with Mary Jones, who asserted to him that the sexual encounter was not consensual.

Rumors of sexual contact between Michan Carter and Mary Jones immediately circulated on social media among the Together Church congregation. With the grapevine activated, Mary Jones visited her friend and colleague, Christina Vickers, at Vickers' residence on an unidentified day in May 2019. According to Jones, she spoke to Vickers for the purpose of receiving spiritual guidance and in Vickers' role as a pastor. No one else was present.

Christina Vickers' declaration reads in part:

> Mary [Jones] and her daughter Evalyn came to my house. Mary and I sat on my couch. I hugged her and asked if she was OK. There had been blogs written and people were talking about her and the church on social

18

media.  I wanted to know how she was holding up.  She started to cry, so we sent her daughter to play with my daughter in her room.  I told her I was a safe place, that she could tell me anything she needed or wanted to, but that she also didn't need to tell me anything.  She said she never meant for this to happen.  I said, "what to happen."  She said, "Nina, I had sex with Pastor."  How did this happen?  I asked when?  She said right after TSL [Together School of Leadership].  He called her to her office, and she shut the door and it just happened.  During our conversation she asked me if she seduced him.  I told her that only she could know if she seduced him.  I went on to explain to her that I didn't think she'd be asking that question unless she had a part in it.  I asked if she was attracted to him.  Mary talked about a time that she knew she was, as well as emotionally tied to him but she said she thought she had worked through it.  She said she didn't mean for this to happen.  She asked if I thought she'd ever be able to talk to PA [Pastor April] and PM [Pastor Micahn Carter] again.  She was very concerned about losing her job.  More than anything she just wanted her Pastors back and for everything to go back to normal.  She also kept asking things like "Why am I like this, what is wrong with me?  Am I crazy?"  I said, well we're all a little crazy, I think.

   . . . She said that she talked to a couple therapists, but that they kept calling it rape so she didn't want to go back to them.  She said it wasn't that.  I told her that maybe she needed to talk to someone out of town.  She said she needed a cigarette.  So, we went outside.  She confessed to lying about only smoking five cigarettes, that she had been smoking regularly.  While smoking, she talked a lot about her being worried about Pastor April and what she thought of her.  She wanted to reach out and tell her that she's sorry that she broke her trust.  She was also very concerned about losing her job.  She just wanted to go back to work.  I was not concerned that these topics were confidential in nature as the blogs were very public.

CP at 223-24.

Micahn Carter went for counseling at western Washington's The Center.  After finishing counseling in early June 2019, Carter announced, during a Together Church service, his resignation from the church.  Mary Jones' mother attended the service. Carter told the congregation he engaged in "'an inappropriate incident'" about which he

was "'not proud.'" CP at 97. He had "'made a wrong decision.'" CP at 97. Carter

explained that a doctor, who he visited, diagnosed him with a mental condition that

caused him to say and do things inconsistent with his character. Carter declared that he

had no intention of preaching again.

Kierstin Platt testified, in her declaration, that, around the time that Micahn and

April Carter resigned from pastoring the Together Church, Mary Jones commented that

she hoped both would continue pastoring. Platt attended a Saturday night service, during

which the Carters announced their resignation. That evening, Platt reported to Mary

Jones, who still resided with Platt, of the resignation. Platt averred that Jones, while

reposing on a couch, then remarked: "'maybe I did seduce him. Do you think I seduced

him? Do you think I'm crazy?'" CP at 262. During the following day, the Carters

hosted friends at a birthday party for their youngest son. Platt avowed that Jones stated

that day about the party: "'I wish I could've been there too. I want to see them. I miss

them.'" CP at 262.

According to Mary Jones, she experienced significant trauma after her sexual

encounter with Micahn Carter and the firing from her job. She was prescribed

medication for panic attacks and nightmares. Jones frequently took multiple showers

each day, scratched herself, and encountered difficulty focusing during conversations.

The Together Church arranged for Mary Jones to obtain counseling in Seattle but

she was dissatisfied with the therapists. Pastor Kevin Gerald arranged for the Together

Church to sponsor inpatient treatment for Jones at The Center, where Micahn Carter had

received counseling. While at the facility, Jones worked with a team of five counselors

and was diagnosed with post-traumatic stress disorder.

According to Kierstin Platt, Mary Jones' account of the sexual encounter changed

after she returned from inpatient treatment. The two talked on the phone then.

> When Mary returned from therapy she said "when Micahn raped me
> . . .". I said "Mary, you never told me that you said no." She said she had
> forgotten that she told him no until she had gone to therapy. At that same
> time [her siblings] Maggie and Max's stories changed to calling the
> incident rape as well.

CP at 262.

Pastor Christina Vickers also proclaimed that Mary Jones' characterization of the

sexual encounter shifted after she returned from treatment. Jones then called the episode

a rape. Vickers outlined a telephone call with Jones on June 14, 2019:

> She went on to tell me that her therapists in treatment told her to
> press charges against Pastor Micahn. That's when she told me that she
> didn't want it. I told her what do you mean you didn't want it? She said
> what happened to her, she didn't want it. I asked if she told him no. She
> said she didn't say anything. I told her that what she was saying was the
> opposite of what she had told me, or anyone else and didn't even make
> sense. She was asking before treatment if she had seduced him. She was
> angry at the other therapists for saying that. How did it change to not
> wanting it? I asked if she even told the therapists the truth about anything
> and that I was confused by her story. She said she had to go, and we got off
> the phone.

CP at 223-24. According to Mary Jones, she spoke to Christina Vickers on the phone

with the expectation of privacy because of Vickers' role as a pastor.

21

Micahn Carter and his family moved to Birmingham, Alabama on July 1, 2019. The Church of the Highlands, an affiliate of the Together Church, commenced a two-phase restoration plan to rehabilitate Carter. The restoration team overseeing Carter's rehabilitation included pastors Chris Hodges, Kevin Gerald, and Dino Rizzo. The plan required that Carter submit monthly reports and participate in monthly calls with at least one team member. Mary Jones understood that Carter would enter a "rehabilitation" program at the Church of the Highlands in Alabama and would not preach during that time. CP at 42.

The Church of the Highlands hired Micahn Carter as a pastor in January 2020. Carter preached his first sermon on July 26, 2020.

In the summer of 2021, Mary Jones learned of Micahn Carter's preaching during the past year, which contradicted her belief that Carter would not preach. Jones complained to Pastor Kevin Gerald, who encouraged her to directly contact Pastor Chris Hodges at the Church of the Highlands.

On July 13, 2021, Mary Jones sent a letter to Pastor Chris Hodges, one of the communications over which Micahn Carter claims defamation. The Hodges letter depicted the April 29, 2019, sexual encounter with Micahn Carter as "rape." CP at 43. The entirety of the Hodges letter reads:

> Dear Pastor Chris Hodges,
> My name is Mary Jones. I've gone through every Avenue I could think to reach you but I hoped personally reaching out would be best received. I wanted to notify you that on April 29th of 2019, Pastor Micahn

22

Carter raped me in my office during a leadership event. I don't say that lightly or naively assume you will take action.

My motive for reaching out to you is only in that I deeply love the Church. I type that statement with tears in my eyes because it's something I've clung to and had to fight for these last few years. I have so much respect for you and what you have built. Your sermons have helped mature my own faith. I humbly acknowledge the ramifications of this statement, but in the same breath, I have been carrying this for two years too long. I am trying to actively pursue God, build His Church and raise my daughter and keeping this to myself is further adding to the hurt. My hope is that God would bring healing, restoration and use this for His glory.

I don't have any specific expectations of what you will do with this information but I am blindly believing that you will do what's best for the people in your church. You could throw this letter in the garbage and I would never know. Regardless, my plan is to tell the truth. I want to show you honor in letting you know, again, because I honor what you've done and who you are in the body of Christ. I am going to tell the truth, and I don't think I will ever stop, but I don't want that to negatively effect [sic] you or your ministry.

I appreciate and am grateful for your time in reading this. I am available for any questions if you may have them.

. . . .

Thank you again Pastor Chris for hearing me out.
All the best,
Mary Jones

CP at 54.

On July 21, 2021, Mary Jones published her blog post titled "Moving Forward," the second communication on which Micahn Carter bases his cause of action in defamation, on the popular blogging platform Medium. CP at 47-52. Medium allows writers and bloggers to share their ideas and stories with a wide audience. We do not know, however, how many, if anyone, read the post. In another setting, we would place

the entire lengthy blog in an appendix, but because of the importance of the entire writing

in a defamation action, we encourage the reader to read the entirety now.

Mary Jones
Jul 21, 2021, • 9 min read *Listen

Moving Forward

I did not grow up in church.  In fact, if you would have told my classmates I'd end up in church, they'd probably burst into laughter.  But I ended up at Together Church in little ol' Yakima, WA, and I remember feeling like I could exhale for the first time.  It was my safe place.

I served in that same church for 7 years and was hired on staff as Assistant to the Lead Pastor and his wife, who served as Executive Pastor, where I served for 1 year.  My duties were never clearly explained to me, so I stepped in wherever I could.  Laundry, school pick up for their children, errands; I would do it all simply because I felt so honored that they would ask me to be their assistant.

I carried a lot of shame being a single mom learning to navigate dating and I sure did not feel anywhere qualified to work for a church.

To me, the staff members were like superheroes.  It felt like what I had learned there, and the community of family I had found, saved my life.

During my time on staff, I worked a ton.  I would often work late nights due to events in the evenings and I would be up extremely early to get a jump start on my duties.  We held services on Saturdays and Sundays as well and I struggled to maintain friendships and balance a working mom agenda.

Our staff had a "'whenever, wherever, however, I'm all in," mentality which was often encouraged by our Senior pastor.  While I didn't have much experience in church staff, I enjoyed that feeling of family.  The pastors felt like my parents.  They had been the first people I told I was pregnant to. They had counseled me through every mistake or success in my adulthood. They helped me buy a car and gave me advice on who to

live with or where to live. I respected and trusted their advice over all others and that was often reinforced.

While I can confidently say that many times were happy, I can also confidently say that one event shattered the memory of those moments.

It's hard to pinpoint where exactly dynamics changed or assume it was all disingenuous. Our pastor was very lovey; kissing our cheeks and always hugging us and complimenting us. It felt fatherly and, to be honest, I was grateful to have a father figure to protect me because I really longed for that.

My pastors included me in a lot of areas in their lives. My pastor would let me work in his office, he would ask my opinion on things as would his wife, they would encourage me, tell me when I looked pretty and correct me. When boys wanted to date me, they had to go through him. I hadn't had that before. It created a space where I felt completely safe and trusted them—and only them.

I came from a pretty broken childhood and young adulthood, so I often felt uncomfortable with all the touchy-feely moments or compliments from him. I remember my pastors would reassure me that I didn't know how to be loved. I remember my pastor would tell me "I'm trying to teach you how to be loved."

But at some point, the intent behind those actions did change. There was one instance where my pastor made inappropriate comments referring to having dreams about me. When he asked if I had dreams about him, I kept my head down and he seemed frustrated. I remember feeling so gross and confused. It's not flattering when your hero looks at you sexually. That same conversation, I remember trying to change the subject multiple times, hoping to shift towards some sort of normalcy with no success. He continued toward me, hugging me and then attempting to grab me and pull me in, grabbing my backside sexually [unreadable] just keeping my hands in an "X" across my chest and my head down, repeating the same thing over and over. He eventually stopped and I just wanted everything to go back to normal.

I didn't tell many people. I felt ashamed and dirty and confused. It didn't make sense how my pastor could see me as his daughter one day and

25

a different way the next. I didn't know if anyone would believe me. God was using him on platforms all around the world. His book was soon to be released, and it seemed to me that if God was using him to such big heights, that I must be the problem.

He texted me that afternoon apologizing for dishonoring me and I simply texted back "love you," hoping to reassure him that we could just let it go. My lack of words upset him, and he continued the rest of the week, publicly in front of staff, calling me "2 words Mary" or only responding to my work-related questions in 2 words in order to punish me. It felt like a roller coaster, but I decided that "nothing happened," and I could keep it to myself. I felt that I had protected him from doing something even more foolish, even though it really hurt me. I felt like I knew his character to be the opposite and, when he later cried and apologized, I chalked it up to a one-time poor moment. He said that he knew I would do anything for him and he took advantage of that.

I remember hearing in leadership teachings about the story of Noah in the Bible, when he got drunk and one son covered and protected and one exposed and the one that covered was blessed. I felt like I could be the daughter that covers in a weak, out-of-character moment, no matter how much it hurt me. He later told me that I had a "spirit of sexuality" on me and that I had caused the moment. He said, "I apologized to you for it because that's who I am, but you need to own it. "My wife and I are here for you." I didn't really know any better, and so I believed him. I didn't see it as him being manipulative or attempting to pass responsibility for his actions. I just thought that it made more sense.

I was so anxious every day. I felt as if I had gone from having to get my pastor off of me, to being in trouble for declining his advances to dealing with his fit of sobbing [unreadable].

It did seem like he had returned for a brief time, although I can't confidently say whether or not that is true. I had taken the compliments and counsel and parenting advice I had received even up until the day before April 29th as him and his wife pastoring me.

However, on April 29th, 2019, during a leadership event right before leaving for dinner, my pastor raped me in my office while most of our staff, teams and my family stood just outside the door.

He attempted to grab me before the event started, more aggressively than the previous time, and I felt like my feet were frozen still. No conversation led up to it. We were talking about what glasses I was going to buy for Pete's sake. What was happening didn't make sense to me and my "please stop" whispers didn't throw him off in the slightest. When he stopped, I remember feeling sick and knowing I had to quit. I felt heartbroken for the father relationship I had lost, I felt angry, and confused. I wondered if I truly had a spirit of sexuality on me and if I would ever get it off. During the event, he hugged me and apologized and asked if I was going to act weird around him. I told him I wouldn't. My mom noticed something was wrong and called me immediately after the event. I told her I wasn't okay, when someone walked by and said pastor was looking for me in my office, I quickly got off the phone.

I walked in expecting the crying fits of apologies that I had previously experienced following his advances. Instead, he began to grab me again more aggressively and unstable than earlier that night. He turned me around. It felt too quick for my brain to catch what was happening. I felt stunned and frozen but tried my best to stop him by spinning around, waving my hands, and mustering my voice to say "Please don't do this, you'll regret it." He turned me back around. I remember looking at my shoes and noticing a stain on the suede, then hearing the sound of his belt buckle and knowing it was over. He had raped me.

Afterwards he felt bad for "cheating on his wife." I was in shock. I remember whispering "I quit," which he said was stupid.

[Unreadable]. I remember feeling so disoriented and like my skin was crawling. She [my mother] assisted me the best a mom in that position could. I remember being scared. Too scared to go to the police or a hospital or to staff members. If the person I trusted the most could do that, how could I trust anyone else?

Our church didn't exactly have an HR department. When it came to reporting, that went through the executive pastor, which happened to be his wife. I felt hopeless and like I had nowhere to turn.

My mom ended up taking me to a therapist's house who called a trauma therapist to meet me the next day. We developed a plan for me to be

able to quit without throwing the pastor's life away publicly because I truly wanted his family to be okay. I would spend the remainder of the week at home and making sure that their son's birthday would still go well, even though I was leaving. However, 4 days later my pastor confessed to "an affair."

I didn't have any energy to argue otherwise. I didn't think it was my place to confess my pastor's sins. I was in shock and unable to even take care of myself. I remember showering for as long as I could multiple times a day. I had to throw whatever energy I could muster into healing and taking care of my daughter.

I moved to Spokane, WA because it was hard to heal and defend myself at the same time, since my pastor had created and reinforced a bubble where he and his wife were parental figures that I relied on and solely trusted, then distorted that and abused it in the worst possible way. I was wounded in the safest place I knew by the safest person I knew. I wasn't sure if I was ever going to be okay.

I knew I needed a community and I wanted my daughter in church, but I didn't ever think my relationship with God would be the same. I didn't understand why He would put me in that position. That job felt like the greatest blessing.

Coming forward to my new pastors happened over a period of time. I didn't know if I would be believed or even given the time of day but I was relieved to be met with love every step of the way.

Through intense therapy, great community and encouragement from my new pastors, I realized that man failed me big time, but God never did. It broke His heart too. I saw all the moments where He protected me, the people He brought me and the doors He opened for me. I wish I could list every single one.

Although this wounded me, and I will probably never forget it, I am determined to see God use it. I'm determined to raise my daughter to love the church, for what it's meant to be. To know the difference between honoring God and being loyal to man, and to never carry shame that's not hers to carry. I am just so determined to see God use it for good.

Moving forward, my eyes are fixed on building God's Church and His people. I understand now the difference between honoring God and putting man above God. I know there are many other steps to take towards healing but my intent in writing this is not only to tell the truth but to let God use it for His glory and His good. Through this, I hope to see His will done in my life and in the lives of others around me well beyond this moment.

"And I am certain the God, who began the good work within you, will continue His work until it is finally finished on the day of Jesus Christ." - Philippians 1:6

CP at 8-13.

On July 20, 2022, Micahn Carter filed a defamation suit against Mary Jones in Alabama state court. Carter alleged Jones published false statements in the Hodges letter and the blog post. Carter alleged that Jones' communications caused him a loss in employment and harm to his reputation in the community. He added that he also lost paid publishing contracts and paid speaking engagements.

While the case in Alabama pended, Micahn Carter placed a set of requests for admission in the court record, violating Alabama civil rules. The requests sought information about Jones' sexual history. Jones' counsel moved to strike the requests as gratuitous, scandalous, and sexually explicit assertions irrelevant to the litigation. The Alabama trial court granted the motion, ordered the requests for admission removed from the record, and sealed the case file. The Alabama court dismissed the action for lack of personal jurisdiction over Mary Jones.

PROCEDURE

On July 12, 2023, Micahn Carter filed, in Yakima County Superior Court, this second defamation action against Mary Jones. The complaint alleges that Jones published a false accusation of rape in the Hodges letter and blog post. According to the complaint, Jones' false claims cost Carter his job, damaged his community reputation, caused mental anguish, humiliation, and embarrassment, and led to "lost paid publishing contracts and other paid speaking engagements." CP at 5.

On November 20, 2023, Mary Jones filed a motion to dismiss, a summary judgment motion, and a special motion for expedited relief under the Washington UPEPA. Declarations from Jones, her mother Laurie and Pastor Kevin Gerald accompanied the motion. Micahn Carter then filed substantially the same sexually explicit requests for admission, which the Alabama court had struck, into the Yakima County Superior Court clerk's file. The trial court granted Jones' motion to seal the requests.

In her special motion for expedited relief, Mary Jones cited three web pages for the superior court's review: (1) Greg Garrison, *Church of the Highlands Cuts Ties with Minister Accused of Sex Abuse*, AL.COM (July 31, 2021, 11:52 AM), https://www.al.com/news/2021/07/church-of-the-highlands-cuts-ties-with-minister-accused-of-sex-abuse.html; (2) ARC Churches, *ARC Conference - Birmingham 2017*, Internet Archive (May 11, 2017*),* https://archive.org/details/podcast- arc-conference-

birmingham-20 main-session-7 7 1000385314987; and (3) Made for the Middle: *Book Overview*, THOMAS NELSON, https://www.thomasnelson.com/9781400208975/made-for-the-middle/ (last visited Oct. 30, 2025). Jones argued the webpages demonstrated Micahn Carter's public figure status for purposes of the defamation cause of action. Jones also references the webpages in her appeal brief. The first webpage, an article in Birmingham, Alabama, news source, declared in part:

> Micahn Carter, former pastor of Together Church in Yakima, Washington, had stepped down in April 2019 from Together Church for undisclosed reasons. Carter joined the staff of the Church of the Highlands in Birmingham later in 2019.
> Carter, with nearly 40,000 followers on Instagram, had grown Together Church from 50 members to thousands and drew thousands of viewers to his sermons on YouTube.

The second webpage no longer exists. The third webpage references a book entitled *Made for the Middle*, authored by Carter and published by Thomas Nelson in 2019. The webpage reads in part:

> Book Summary
>
> In a culture that demands we pick a side in every debate, Pastor Micahn Carter delivers a bold call for Christians to be instruments of unity, togetherness, and love.
>
> About the Book
>
> With so many hot-button issues causing divisiveness in our culture, many Christians are struggling to live out their faith. There is a way, says Micahn Carter. Jesus modeled it perfectly: He stood strong in the middle of tension and loved people outside of His comfort zone.
> Growing up in a home mired in conflict, Micahn Carter learned how to unify people at an early age. As a young adult, he was skilled at

understanding all sides of an issue and building togetherness.  Then he became the pastor of a small, predominantly African-American church in downtown Yakima, Washington, where he reached out to people of different cultures, races, relationships, and opinions.  Within a few years, Together Church grew into a thriving, multi-racial community of several thousand members that now spans three campuses.

In *Made for the Middle*, he reminds Christians that God sent his Son to die for broken humanity so that reconciliation could be a new way of life—reconciliation between God and man, and through the power of Jesus, reconciliation among humankind.

*Made for the Middle* provides a roadmap for resisting the urge to pick a side in the latest cultural debate and fighting instead for unity, for together, for love.  Transformation is possible only when we take the time to build relationship, to seek to understand, and to follow Jesus's example of creating unity.

In opposition to Mary Jones' special motion, Micahn Carter filed declarations of pastors Kierstin Platt and Christina Vickers.  Mary Jones moved to strike portions of Platt's and Vickers' declarations as covered by the clergy-penitent privilege.

On February 9, 2024, the trial court issued an order and letter opinion finding that Washington's UPEPA applied because "the fact that the married, lead pastor had sex with his employee/parishioner at the church facility immediately after a public event is a matter of public concern."  CP at 278-82.  Nonetheless, the court denied the UPEPA motion to dismiss the suit.  The court concluded that Carter met his burden to establish a prima facie defamation cause of action.

The superior court also denied Mary Jones' motion to strike portions of the declarations of Kierstin Platt and Christina Vickers based on the clergy-penitent privilege.  The superior court entered no formal findings of fact when denying the

motion. In its letter ruling, the court concluded that both pastors held ecclesiastical positions. Nevertheless, neither acted in their roles as pastors when Jones spoke to each about her sexual encounter with Micahn Carter. Jones spoke to both because of their being her friends and coworkers. She also spoke to Platt because Platt was a housemate. Also, according to the superior court, Jones uttered no confession to either friend. Jones did not speak to either with a reasonable expectation that the communications would remain privileged particularly given the multiple persons told by Jones of the sexual encounter during this time frame. Finally, the first time Jones spoke to Kierstin Platt, Jones' mother was present. During the second conversation, Jones' brother and sister were present.

Pursuant to RAP 2.2(a) and RCW 4.105.080, Mary Jones filed an appeal as a matter right from the trial court's denial of her UPEPA motion.

## LAW AND ANALYSIS

On appeal, Mary Jones assigns error to two subordinate rulings and the principal ruling of the superior court. The two subordinate rulings are the court's refusal to strike portions of the declarations of Kierstin Platt and Christina Vickers and the court's refusal to consider the newspaper article about the Together Church, the ARC article, and the web advertisement for Micahn Carter's book. We have no need to and do not address whether the penitent privilege applies to some of Platt's and Vickers' testimony. We address the challenge to the exclusion of evidence first. Jones' principal assignment of

33

error challenges the superior court's denial of her special UPEPA motion. A granting of the motion would dismiss Michan Carter's suit for defamation.

The survival of Michan Carter's suit in the face of the UPEPA depends on whether he presents facts sufficient to defeat a summary judgment motion to dismiss his defamation claim. On appeal, Mary Jones contends the superior court erroneously concluded that Carter presented evidence fulfilling three of the elements of a defamation cause of action. Those elements are false facts, fault of the speaker, and lack of a privilege blanketing the communication.

In response to all of Mary Jones' challenges on appeal, Micahn Carter argues that the superior court entered findings of fact, to which Jones assigned no error. In turn, Carter contends that Jones is bound by the findings, which effectively defeats her appeal.

We organize our legal analysis into five sections: (1) superior court findings of fact, (2) the clergy-penitent privilege, (3) the hearsay objection to the webpages cited by Mary Jones, (4) defamation, and (5) the UPEPA. We further organize each section into numerous issues.

Findings of Fact

*Issue 1: Should this reviewing court ignore Mary Jones' arguments because she neglected to assign error to the superior court's findings of fact?*

*Answer 1: No.*

Micahn Carter claims that the superior court entered findings of fact when ruling on the clergy-penitent privilege, when snubbing the common interest privilege's application to the Hodges letter, when ruling that Mary Jones abused any common interest privilege, when rejecting Micahn Carter as a limited public figure, and when finding a question of fact as to whether Jones knew her accusation of rape to be false. Carter then correspondingly notes that Jones assigned no error to those findings of fact. Thus, according to Carter, Jones, under RAP 10.3(a)(4), is bound by the findings.

Thereafter, Carter does not, in his brief, analyze whether the privilege applies. We assume that Carter believes the application of the findings of fact inescapably leads to rejection of the motion to strike the questioned portions of Kierstin Platt's and Christina Vickers' declarations.

We decline Micahn Carter's invitation to shortcut our review of Mary Jones' challenge to the declarations for multiple reasons. First, although the superior court, in its letter ruling, outlined some of the facts, the court entered no formal findings of fact for our review. When the superior court does not explicitly delineate findings, the appellate court holds a prerogative to exercise its own authority in determining what facts have actually been found in the superior court. *Tapper v. Employment Security Department*, 122 Wn.2d 397, 406, 858 P.2d 494 (1993). Presumably this principle extends to the reviewing court's prerogative in determining that the superior court entered no findings of fact.

35

Second, many of the purported findings, on which Carter relies, carry the nature of conclusions of law, not findings of fact. Third, the superior court entertained no live testimony when responding to Mary Jones' motion to strike. When the trial court considers only documentary evidence to decide whether a privilege applies, we review the evidence de novo. *Jane Doe v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, 122 Wn. App. 556, 563, 90 P.3d 1147 (2004); *State v. Wood*, 45 Wn. App. 299, 311, 725 P.2d 435 (1986).

Fourth, this court decides de novo all superior court rulings attended to its ruling on a UPEPA motion. The UPEPA motion, as analyzed later, parallels a summary judgment motion. When reviewing a summary judgment ruling, an appellate court would not accomplish its charge if the court did not examine all the evidence presented to the trial court, including evidence that the superior court redacted. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). The appellate court uses a de novo standard of review when reviewing all trial court rulings made in conjunction with a summary judgment motion. *Folsom v. Burger King*, 135 Wn.2d 658, 663 (1998).

Fifth, Mary Jones' brief enthusiastically notified Micahn Carter and this court of her challenge to the various rulings and the basis of the challenges. Thus, Carter suffers no prejudice by any failure to assign error by Jones. We may waive any purported violation of a court rule that prejudices the opposition none. RAP 1.2(a).

Clergy-Penitent Privilege

Mary Jones assigns error to the superior court's refusal to strike portions of the declarations of Kierstin Platt and Christina Vickers. Jones argues the clergy-penitent privilege covers the challenged portions of the declarations. We decline to address the assignment of error because our consideration of the entire declarations does not change the outcome of the appeal. Although we do not avoid the assignment of error for this reason, we also perceive the challenged declaration sections bolster Jones' case because the testimony shows Pastor Micahn Carter to have groomed Jones for sexual activity and further shows Jones' susceptibility to grooming.

Webpages

*Issue 2: Whether the webpages cited by Mary Jones in her special motion for relief constituted inadmissible hearsay?*

*Answer 2: We do not address this issue because the webpages no longer exist or were unauthenticated.*

We move to Mary Jones' assertion that the trial court erred when refusing to consider webpages referencing Micahn Carter when the court ruled on her special motion to dismiss under the UPEPA. The superior court excluded the articles from its consideration on the basis of the hearsay rule. Jones contends she did not seek to introduce the articles for the truth asserted therein but to show Carter's ready access to

37

communication, a factor that establishes his being a public figure for purposes of a defamation cause of action.

We do not reach Mary Jones' assignment of error. Mary Jones asks the court to review an article written by Greg Garrison and by the ARC churches. But she does not attach either to a declaration. The internet link given for the second site no longer leads to the article.

We can open the third webpage, which purportedly advertises a book written by Micahn Carter. But no person testified to the authenticity of the webpage or the website on which the page is found. Like a photograph, an exhibit purporting to represent an electronic source such as a webpage needs authentication from a witness with direct knowledge that the exhibit fully and fairly reproduces the page. *Weinhoffer v. Davie Shoring, Incorporated*, 23 F.4th 579, 582 (5th Cir. 2022); *Thompson v. Bank of America National Association*, 783 F.3d 1022 (5th Cir. 2015); *Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014); *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011). Therefore, we do not rely on any of the three webpages during the resolution of this appeal.

## Defamation

We now analyze Micahn Carter's defamation action. We later intertwine Carter's defamation claim with Mary Jones' defense under the UPEPA.

A claimant suing for defamation must establish: (1) falsity of the speaker's statement, (2) unprivileged nature of the statement, (3) fault of the speaker, and (4) the statement proximately caused damages. *Life Designs Ranch, Inc. v. Sommer*, 191 Wn. App. 320, 330, 364 P.3d 129 (2015); *Alpine Industries Computers, Inc. v. Cowles Publishing Co.,* 114 Wn. App. 371, 378, 57 P.3d 1178 (2002). Some Washington cases add a fifth element that demands the communication be about the plaintiff. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986); *Sims v. KIRO, Inc.*, 20 Wn. App. 229, 233, 580 P.2d 642 (1978). Other states expressly add more elements, implied in Washington's four elements: a publication of the statement, and the statement being one of fact rather than opinion. *Meloff v. New York Life Insurance Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (applying New York law). We thus list eight elements for a defamation cause of action: (1) a false, (2) unprivileged (3) statement (4) of fact, not opinion, (5) about the plaintiff, (6) broadcasted to another, (7) with fault of the speaker, and (8) damages to the plaintiff. Constitutional restraints overarch these elements.

Mary Jones argues that Micahn Carter fails to present facts to comply with four elements of defamation: unprivileged communication, factual statement, falsity, and fault of the speaker. She limits her argument of privilege to the Chris Hodges letter. We address the four elements in such order after addressing a request from Carter to deny review. We conflate our analysis of falsity with fault.

We conclude that the common interest privilege blankets Mary Jones' letter to Chris Hodges. Therefore, to prevail, Micahn Carter must demonstrate that Jones knew that the statement of rape in the letter was false or she proceeded in reckless disregard of the truth. We shorthand this standard of liability by the phrase "actual malice." We also conclude that Carter qualifies as a limited public figure. For this reason, Carter must fulfill the actual malice burden for Jones' assertion of rape, not only in the Hodges letter, but also in the blog post.

We conclude that at least a question of fact exists as to whether the allegation of rape in the Hodges letter constituted a statement of fact, rather than opinion. Nevertheless, because we conclude that the undisputed evidence does not pose a question of fact as to actual malice, we dismiss the defamation claim, based on the Hodges letter, because of the attended common interest privilege. We conclude that, because of Jones' insertion of the lengthy background between Carter and her in the blog post that the allegation of rape in the post constitutes nonactionable opinion, not fact. We finally conclude that, because of the lack of evidence showing actual malice and because Carter qualifies as a limited public figure, Carter's claim of defamation fails for this additional reason.

In granting summary judgment to Mary Jones on Micahn Carter's claim of defamation, we emphasize the importance of summary judgment in defamation cases. We highlight Carter's failure to testify to underlying facts and his denial of any memory

of the sexual encounter. We acknowledge a lack of direct evidence of consent by Jones to the sexual encounter. We underscore Carter's role as a minister and his announcement in church of engaging in wrong behavior because of a mental illness. We observe that Carter brings this suit in part to restore his public standing as an important internet evangelist and book author. We stress the employment and pastoral relationship between Carter and Jones. Finally, we note a long history of predatory sexual behavior toward women in the workplace and the abuse of trust when a pastor pursues sex with a parishioner.

We address Micahn Carter's defamation cause of action in the context of a summary judgment motion. On the one hand, courts apply the standard summary judgment principles in a defamation suit. On the other hand, reviewing courts appear more willing to stretch some of those rules in order to grant summary judgment dismissal of a defamation cause of action grounded in the First Amendment to the United States Constitution.

In the First Amendment area, summary procedures are essential. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966); *Mark v. Seattle Times*, 96 Wn.2d 473, 484-85, 635 P.2d 1081 (1981). Summary judgment in defamation suits has "particular value" in avoiding the "chilling effect of protracted litigation." *Immuno AG. v. Moor-Janowski*, 77 N.Y.2d 235, 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991). Harassment by litigation endangers free debate. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968

(D.C. Cir. 1966). Unless persons desiring to exercise their First Amendment rights possess freedom from the aggravation of lawsuits, they will tend to become self-censors. *Mark v. Seattle Times*, 96 Wn.2d 473, 484-85 (1981). Debate on public issues and the conduct of public officials will grow inhibited, less robust, and less wide-open. Censorship impacts the whole public even when privately administered by a defamation plaintiff. *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).

*Issue 3: Does the common interest privilege blanket the Hodges letter for purposes of defamation?*

*Answer 3: Yes*

We later thoroughly explore a common issue in defamation litigation that revolves around the fault of the speaker. Under some circumstances, the defamation plaintiff need only show the speaker negligently uttered a false communication. *Dunlap v. Wayne,* 105 Wn.2d 529, 534-35, 716 P.2d 842 (1986). Under other circumstances, the plaintiff must show the speaker broadcast a false statement knowing the statement to be false or with reckless disregard for the falsity of the statement, known as the actual malice standard. The defamation defendant may force the claimant to fulfill the higher actual malice standard if the defendant establishes her communication garnered a privilege.

Washington recognizes a conditional, common interest privilege that shields some statements that might otherwise be defamatory. *Moe v. Wise*, 97 Wn. App. 950, 963, 989 P.2d 1148 (1999). The court decides the existence of this privilege as a matter of law.

*Moe v. Wise*, 97 Wn. App. 950, 957 (1999); RESTATEMENT (SECOND) OF TORTS §§ 593-597 (Am. Law Inst. 1977).

A conditional privilege attaches whenever someone with a common interest could fairly conclude the recipient of the information can benefit from the information. *Moe v. Wise*, 97 Wn. App. 950, 963, 989 P.2d 1148 (1999). The speaker loses this privilege, however, if the plaintiff proves by clear and convincing evidence that the speaker abused it by knowingly or recklessly misstating facts, acting outside the shared interest, disclosing the statement beyond the privileged circle, needlessly expanding its scope, or mixing privileged with unprivileged content. *Lillig v. Becton-Dickinson*, 105 Wn. 2d 653, 658, 717 P.2d 1371 (1986); *Moe v. Wise*, 97 Wn. App. 950, 963 (1999).

Mary Jones sent her letter only to Pastor Chris Hodges at the Alabama Church of the Highlands, where Micahn Carter preached. Jones mailed the letter at the recommendation of Pastor Kevin Gerard. Any church would want to know whether a married pastor engaged in sexual intercourse with his assistant on church property. The church would particularly wish to know if the sex lacked consent.

In opposition to the privilege, Micahn Carter asserts irrelevant and overstated positions. According to Carter, the Church of the Highlands already knew of the sexual intercourse since the church participated in Carter's treatment and restoration plan. Nevertheless, we do not know to what extent Chris Hodges and other church leaders knew of the details of the sexual encounter. Also, as admitted by Carter, the Alabama

43

church did not know that Jones claimed rape. The privilege may extend to a false accusation of rape if not uttered in malice. The content of the communication lacks importance as long as the parties hold a mutual interest in the content.

Micahn Carter asserts that Mary Jones focused the Hodges letter on her healing rather than protecting the Church of the Highland women from Carter or her bettering the church. In doing so, Carter overplays the facts. Jones wrote in the letter that she hoped for healing, but the reader is not certain whether she asks for her own healing, healing for the church, or both. More importantly, she also writes to alert the Alabama church to the character of Carter.

In her declaration, Mary Jones cites as her motivation for sending the letter as an understanding that Micahn Carter would not preach until after he completed his rehabilitation plan. By the time she sent the letter, she had learned that he had begun preaching earlier than planned. We agree with Carter that his premature speaking motivated the Hodges letter, but the declaration does not exclude other motivations and the stated motivation overlaps with attempting to protect the Church of the Highlands from a purported sexual predator. In the letter, Jones asked Pastor Chris Hodges to use the information as he deems best for the Alabama church.

The trial court wrongly conflated the Hodges letter with the blog post when determining that Jones lost the privilege covering the letter when she also sent her blog post. If the communicant broadcasts the same information to others without a common

interest the other broadcast does not enjoy the privilege, but the first broadcast still retains the privilege. Each communication of the same defamatory content by the same speaker forms a separate and distinct publication. *Momah v. Bharti*, 144 Wn. App. 731, 753, 182 P.3d 455 (2008); RESTATEMENT (SECOND) OF TORTS § 577A cmt. a. Mary Jones only sent the Chris Hodges letter to Hodges. She did not copy anyone on the letter. She did not rebroadcast the letter.

One Washington and one foreign decision reinforce our decision. In *Hitter v. Bellevue School District No. 405*, 66 Wn. App. 391, 832 P.2d 130 (1992), this court ruled that a school principal's remark to a student's mother that a teacher's aide had been accused of improper touching was conditionally privileged. In *Redgate v. Roush*, 61 Kan. 480, 59 P. 1050 (1900), the Kansas Supreme Court granted elders of a church a privilege for defamation when the elders circulated articles warning others that the plaintiff lacked worthiness as a pastor. The information legitimately concerned other congregations.

No privilege attached to Mary Jones' blog post. She does not argue to the contrary.

*Issue 4: Without addressing whether Mary Jones violated the standard of fault applied to a qualified privilege, did Jones abuse the common interest privilege blanketing the Hodges letter?*

*Answer 4: No.*

We have ruled to afford Mary Jones the common interest privilege for her sending the July 2021 letter to Chris Hodges. But this privilege is a qualified, not absolute, privilege. *Valdez-Zontek v. Eastmont School District*, 154 Wn. App. 147, 163, 225 P.3d 339 (2010). A defendant may lose the privilege if the plaintiff establishes abuse of the privilege. *Bender v. Seattle*, 99 Wn.2d 582, 601, 664 P.2d 492 (1983). Proof of an abuse of a qualified privilege must be established by clear and convincing evidence, not simply by a preponderance of the evidence. *Bender v. Seattle*, 99 Wn.2d 582, 601 (1983); *Mark v. Seattle Times*, 96 Wn.2d 473, 492, n.5, 635 P.2d 1081 (1981). Even a private plaintiff must satisfy this high standard by clear and convincing evidence. *Bender v. Seattle*, 99 Wn.2d 582, 601 (1983).

The communicant may abuse a qualified privilege when communicating under circumstances unrelated to the purpose behind the common interest privilege. These circumstances are: (1) she does not act for the purpose of protecting the interest that is the reason for the existence of the privilege, (2) she knowingly publishes the matter to a person to whom its publication is not otherwise privileged, (3) she does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given, or (4) she publishes unprivileged as well as privileged matter. *Valdez-Zontek v. Eastmont School District*, 154 Wn. App. 147, 162-63, 225 P.3d 339 (2010). The presence of the first circumstance means the privilege never existed in the first place such that an abuse the privilege is irrelevant.

Other than asserting that Mary Jones did not challenge the finding of fact that she abused the privilege, Micahn Carter does not otherwise contend Jones abused the privilege. As already analyzed, Jones believed that Carter should no longer be preaching because of his predatory behavior. She sent her letter only to the lead pastor of the church where Carter then preached. She did not write beyond the topic of her sexual encounter with Carter.

*Issue 5: What measure of fault must a defamation plaintiff establish to defeat a qualified privilege?*

*Answer 5: Knowledge of falsity or reckless disregard of the truth.*

Early Washington decisions held that a defendant abuses a qualified privilege if she acted (1) without fair and impartial investigation, or (2) without reasonable grounds for believing in the truth of the statement. *Gem Trading Company v. Cudahy Corporation*, 92 Wn.2d 956, 959-60, 603 P.2d 828 (1979); *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 564 P.2d 1131 (1977); *Taskett v. KING Broadcasting Company*, 86 Wn.2d 439, 445, 546 P.2d 81 (1976). Later decisions hold that the claimant must show knowledge or reckless disregard as to the falsity of a statement to prove abuse of a qualified privilege, the actual malice standard. *Bender v. Seattle*, 99 Wn.2d 582, 601, 664 P.2d 492 (1983); *Hitter v. Bellevue School District No. 405*, 66 Wn. App. 391, 401, 832 P.2d 130 (1992). The plaintiff must establish actual malice by clear and convincing

evidence, not simply by a preponderance of the evidence. *Bender v. Seattle*, 99 Wn.2d 582, 601 (1983); *Mark v. Seattle Times*, 96 Wn.2d 473, 492 n. 5, 635 P.2d 1081 (1981).

Micahn Carter advocates for the lower standard of proof. We reject the lower standard for numerous reasons. First, *Bender v. Seattle* presents the Washington Supreme Court's latest pronouncement on the abuse of a qualified privilege. Second, the Supreme Court, in *Bender v. Seattle*, reviewed foreign cases, after which it adopted the reckless disregard standard. Third, the earlier standard equates to a negligence standard. Nevertheless, in any defamation case the plaintiff must at a minimum show negligence. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 588, 943 P.2d 350 (1997). Therefore, the earlier standard affords no protection to the speaker beyond that available to one without a qualified privilege. The privilege would no longer serve any purpose.

*Issue 6: Whether Micahn Carter establishes with clear and convincing evidence that Mary Jones knew the falsity of her rape charge or recklessly disregarded the truth such that the common interest privilege does not shield Jones?*

*Answer 6: We reserve this question for later.*

We later hold that Micahn Carter qualifies as a limited public figure for purposes of a defamation action such that he must show actual malice even for the accusation of rape in the blog post. For this reason, we reserve our discussion of whether Carter satisfies the same standard for purposes of the abuse of the common interest privilege.

No. 40285-1-III
*Carter v. Jones*

*Issue 7: Whether Micahn Carter qualified as a limited public figure for purposes of defamation law?*

*Answer 7: Yes.*

In addition to the standard in defamation rising from negligence to actual malice in the instance of a privilege, the law, based on constitutional restraints, lifts the standard to the actual malice test depending on the public stature of the plaintiff. *Bender v. Seattle*, 99 Wn.2d 582, 599 (1983). Even though state law creates a defamation action, state law does not solely delimit the action. *Immuno AG v Moor-Jankowski*, 77 N.Y.2d 235 (1991). The minimum safeguards required by the First Amendment heavily influence the elements of a defamation action. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Defamation defendants who write about public figures and officials, or matters of public interest, receive the protection of the heightened actual malice fault standard. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

Mary Jones seeks to impose on Micahn Carter the status of a limited public figure or to label the nature of her communications as imbued with public interest with regard to both communications: the Hodges letter and the blog post. The trial court labeled Carter a private figure. Our analysis remains the same for both communications because the analysis focuses on the repute of the plaintiff.

Both parties argue that this court decides the question of Micahn Carter's public figure ranking as a matter of law. Washington law agrees that the issue of whether the plaintiff qualifies as a public figure poses a question of law. *Clardy v. Cowles Publishing Co.*, 81 Wn. App. 53, 58, 912 P.2d 1078 (1996). This court reviews de novo the question of whether one holds limited public figure status. *Rosenblatt v. Baer,* 383 U.S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966); *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 924 (9th Cir. 2022); *Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371, 392 (2002). Moreover, this court must make an independent examination of the whole record, so as to assure us that a judgment against a defendant does not constitute a forbidden intrusion on the field of free expression. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *New York Times Co. v. Sullivan*, 376 U.S. 254, 284 (1964).

Both parties' insistence that this court decide the status of Micahn Carter as a matter of law places this court in a predicament. We may need to weigh evidence when deciding in what category to box Carter. Typically, this court does not weigh facts when determining if the plaintiff presents a prima facie case of a cause of action or when addressing a summary judgment motion. We conclude, however, that the parties are correct. Under both Washington Supreme Court and United States Supreme Court jurisprudence, the status of the plaintiff as a public figure presents a question of law. *Wolston v. Reader's Digest Association*, 443 U.S. 157, 165-169, 99 S. Ct. 2701, 61 L. Ed.

2d 450 (1979); *Krauss v. Globe International, Inc.*, 251 A.D.2d 191, 192, 674 N.Y.S.2d

662 (1998).  In other contexts, this court also decides important constitutional questions

as a matter of law, by weighing evidence, in order to protect constitutional rights.  *City of*

*Bellevue v. Lee*, 166 Wn.2d 581, 585, 210 P.3d 1011 (2009) (due process); *Legion Post*

*No. 149 v. Department of Health*, 164 Wn.2d 570, 608-09, 192 P.3d 306 (2008) (equal

protection); *T.S. v. Boy Scouts of America*, 157 Wn.2d 416, 425, 138 P.3d 1053 (2006)

(First Amendment associational rights); *Roth v. Veteran's Administration of Government*

*of the United States*, 856 F.2d 1401, 1407 (9th Cir. 1988) (public employee's right to free

speech), *overruled in part by Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L.

Ed. 2d 689 (2006).

The United States Supreme Court imposed the higher burden of proof on a

plaintiff who is a public figure after reviewing competing interests in defamation actions.

The plaintiff possesses an interest in protecting his reputation, while society owns an

interest in preserving free speech.  *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 146-47,

87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254

(1964).  The United States Supreme Court created the malice standard for public

officials, in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), to avoid this

interference with free speech.  The Court held that a public official could recover

damages for defamation only if the official proved that the speaker uttered the

defamatory statement with knowledge that the statement was false or with reckless

disregard of its truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

The Court called this test "actual malice," a term previously used in defamation actions

in order to recover punitive damages. *New York Times Co. v. Sullivan*, 376 U.S. 254, 267

(1964). The United States Supreme Court also held that actual malice must be proved

with "convincing clarity." *New York Times Co. v. Sullivan*, 376 U.S. 254, 285-86 (1964).

The nation's high Court, in *New York Times Co. v. Sullivan*, articulated three

justifications for requiring public figures to show actual malice. The first justification

emphasizes self-help. Public figures enjoy greater access to the channels of effective

communication than private individuals and are therefore better able to contradict the lie

or correct the error. Unlike public officials or public figures, private individuals are more

vulnerable to injury and therefore the government has a greater interest in protecting

them. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S. Ct. 2997, 41 L. Ed. 2d 789

(1974). The balance between First Amendment concerns of free speech and the

individual's interest in reputation tips differently when a private individual sues a private

individual for a statement about private concerns. *Taskett v. KING Broadcasting

Company*, 86 Wn.2d 439, 444-47 (1976).

The second and most important justification for distinguishing between a public

figure and a private figure entails the notion of assumption of risk. Public figures, who

have thrust themselves into the public eye, must accept certain necessary consequences of

that conduct, including the risk of closer public scrutiny than might otherwise be the case.

A third justification arises from public officials enjoying immunity from suit for defamation for comments made in the course of official conduct. *New York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964). One who criticizes a public official should enjoy reciprocal immunity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964).

Mary Jones seeks to tag Micahn Carter with public figure standing simply by his being embroiled in the public controversy over the sexual encounter between the two. She emphasizes the superior court's ruling that, under the UPEPA, a lead pastor having sex with his employee and parishioner, regardless of whether or not consensual, at the church facility immediately after a public event constitutes a matter of public concern. The current law instructs us to employ the public interest behind a lawsuit as one factor in determining whether the plaintiff qualifies as a limited public figure. Nevertheless, the malice standard does not apply merely because the controversy holds public importance or concern. Early decisions support Jones' position, but more recent United States Supreme Court and Washington Supreme Court precedent hold that this factor by itself does not create such status.

In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), a plurality of the United States Supreme Court expanded the actual malice standard beyond public figures and instead focused on whether the communication of the speaker implicated a matter of public or general concern. The plurality reasoned:

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or

> because in some sense the individual did not "voluntarily" choose to
> become involved.

*Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 43 (1971).

*Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371, (2002), also supports Mary Jones' position that Micahn Carter's suit involving a matter of public concern inevitably renders him a limited public figure. The challenged newspaper story related to a court decision resolving an intellectual property dispute between a major software manufacturer and a local retailer. Viewed narrowly, the story pertained to a private dispute between two business entities. In a broader context, however, the dispute touched a matter of public importance, software piracy. Alpine allegedly sold counterfeit software to the general consumer. In an age when the use of personal computers was widespread, this court ruled the retail distribution of pirated software of acute importance to general consumers. Thus, the news story qualified as a matter of public concern. More importantly, this court ruled that, despite the plaintiff not being a public figure, the actual malice standard applied because the private figure sought recourse for a "statement relating to a matter of public concern." *Cowles Publishing Co.*, 114 Wn. App. 371, 393 (2002). This court affirmed summary judgment dismissal of the defamation action because the retailer did not present facts showing actual malice. In *Mellor v. Scott Publishing Company, Inc.*, 10 Wn. App. 645 (1974), this court also ruled that the First Amendment privilege applies to any defamation action in which the utterance involved concerns of public or general import.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), a later alignment of the United States Supreme Court ostensibly rejected the *Rosenbloom* Court's approach. The Supreme Court reversed the federal Court of Appeals' ruling that a defendant may raise the *New York Times* privilege because an article concerns a matter of public concern regardless of whether the plaintiff is a public figure.

This court in *Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371 (2002), also breached Washington Supreme Court precedent. Our state high court had previously ruled that an individual, who is neither a public figure nor an official, may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, on a showing that the defendant knew or, in the exercise of reasonable care, should have known that the statement was false. *Mark v. Seattle Times*, 96 Wn.2d 473, 483 (1981). Based on *Mark v. Seattle Times*, Washington follows a negligence standard for defamation actions involving private citizens in matters concerning the public interest. *Mark v. Seattle Times*, 96 Wn.2d 473, 483 (1981).

Beginning with *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974), the law has recognized two species of public figures: a general or general purpose public figure and a limited public figure. The general public figure possesses general fame or notoriety in the community and pervasive involvement in the affairs of society. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974). The person's fame must be very great; the individual must be a household name on a national scale. *Lluberes v. Uncommon*

*Productions, LLC*, 663 F.3d 6, 20 n.14 (1st Cir. 2011). The rare person meets the general purpose public figure test. *Lerman v. Flynt Distribution Co.*, 745 F.2d 123, 137 (2nd Cir. 1984). For defamation purposes, the law deems a general public figure a public figure for all purposes. *Vern Sims Ford, Inc. v. Hagel*, 42 Wn App. 675, 678, 713 P.2d 736 (1986). The actual malice standard applies to any aspect of a public official's life reflecting upon his or her fitness for the position. *Clawson v. Longview Publishing Company*, 91 Wn.2d 408, 416-17 (1979).

Mary Jones is equivocal as to whether she asserts that Micahn Carter qualifies as a general purpose public figure. Regardless we conclude the facts do not show this status. In describing the size of Micahn Carter's fame, Mary Jones cites three webpages that she asserts show that Carter led a church with thousands of members, accumulated a huge online following, and established himself as a major author and public evangelist. We have already ruled we will not consider the pages. Naturally a court cannot consider inadmissible evidence when ruling on a motion for summary judgment. *Dunlap v. Wayne*, 105 Wn.2d 529, 535 (1986). Jones presents no other evidence of Carter being a household name on a national scale.

A limited-purpose public figure is a private citizen who voluntarily injects himself or allows others to draw him into a public controversy in order to influence the resolution of issues involved. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974). The private individual thereby metamorphizes into a public figure for a limited range of issues. *Gertz*

*v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974).  In contrast to the general public figure,

persons who thrust themselves to the forefront to influence resolution of a public issue

are limited public figures only with respect to that issue.  *Camer v. Seattle Post–*

*Intelligencer*, 45 Wn. App. 29, 42 (1986); *Vern Sims Ford, Inc. v. Hagel*, 42 Wn App.

675, 678 (1986).

Under the *Gertz* analysis, the court first asks if the defamatory statement involved

a matter of public concern.  The court next focuses on the nature and extent of the

plaintiff's participation in that public controversy.  The court might ask whether the

speaker engaged the public's attention to influence its outcome or whether he thrust

himself into the vortex of a public issue.  While a private person might become a public

figure through no purposeful action of her own, *Gertz* concluded that instances of truly

involuntary public figures "must be exceedingly rare."  *Gertz v. Robert Welch, Inc.*, 418

U.S. 323, 345 (1974).

State law standards may not control when one becomes a public official for

defamation.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964).  Nevertheless,

the United States Supreme Court has not definitively constitutionalized a test for

discerning a limited public figure.  Based on the teachings of *Gertz v. Robert Welch, Inc.*,

federal circuits have developed varying tests to determine when a person becomes a

limited purpose public figure.  The tests, to diverging degrees, emphasize the plaintiff's

access to channels of effective communication; the plaintiff voluntarily assuming a

prominent role in a public controversy; the controversy being public in the sense that people debate it; the controversy carrying foreseeable and substantial ramifications for nonparticipants; the plaintiff seeking to influence the resolution or outcome of the controversy; the controversy existing prior to the publication of the defamatory statement; the alleged defamation pertaining to the controversy; the plaintiff maintaining access to the media; and the plaintiff retaining public-figure status at the time of the alleged defamation. *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 136-37 (2d Cir. 1984); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir.1994); *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433-34 (5th Cir.1987); *Makaeff v. Trump University, LLC*, 715 F.3d 254 (9th Cir. 2013); *Tavoulareas v. Piro,* 817 F.2d 762, 771-75 (D.C. Cir. 1987).

In *Clardy v. Cowles Publishing Co.*, 81 Wn. App. 53 (1996), this court adopted a five-part test for discerning a limited public figure: (1) access to media; (2) voluntariness and nature of role; (3) statements germane to the controversy; (4) earlier existence of controversy; and (5) the plaintiff retaining a public figure status at the time of the alleged defamation. These factors echo elements promulgated in federal decisions. A court should review all the factors. Nevertheless, the defamation defendant need not show that the claimant's public stature fulfills any particular number of factors. Still, all of the factors as examined below encompass Micahn Carter, his controversial moment of intercourse, and his and Mary Jones' speaking publicly about the sexual encounter.

58

The most important factor distinguishing between public and private plaintiffs is the assumption of the risk of greater public scrutiny of public life. *Clawson v. Longview Publishing Company*, 91 Wn.2d 408, 416 (1979). Of secondary importance is the public plaintiff's ease of access to the press. *Clawson v. Longview Publishing Company*, 91 Wn.2d 408, 414-15 (1979).

Despite not controlling, the subject matter or topic of controversy being of public concern looms important in the public figure analysis. Whether an allegedly defamatory statement pertains to a matter of public concern depends on the content, form, and context of the statement as shown by the entire record. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985). The court evaluates what was said, where it was said, and how it was said. *Snyder v. Phelps*, 562 U.S. 443, 454, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011).

When defining the relevant controversy, a court may identify multiple potential controversies. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297, n.27 (D.C. Cir. 1980). Courts often define the public controversy in expansive terms. *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987). Thus, the relevant controversy may cover more territory than the narrower discussion contained in the defamatory document. *Tavoulareas v. Piro,* 817 F.2d 762, 778-79 (D.C. Cir. 1987); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297, n.27 (D.C. Cir. 1980).

A controversy does not become a public controversy solely because the public finds interest in it. *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S. Ct. 958, 47 L.Ed.2d 154 (1976). To determine the presence of a public controversy, the court must examine whether persons actually discussed the subject and look to see if the press covers the debate. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). A controversy becomes public when a reasonable person would expect persons beyond the immediate participants in the dispute to feel the impact of its resolution. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). Speech addresses a matter of public concern when the content fairly relates to any matter of political, social, or other concern to the community or when the subject possesses general interest and value for the public. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

The United States Supreme Court characterizes a public official as accepting the risk of close public scrutiny as a result of the limelight. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974). Thus, a public official's morality and private behavior may become a matter of public concern. Society's interest in the officers of government is not strictly limited to the formal discharge of official duties. *Garrison v. State of Louisiana*, 379 U.S. 64, 77, 85 S. Ct. 209, 217, 13 L. Ed. 2d 125 (1964). The public's interest extends to anything which might touch on an official's fitness for office. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974). The interest extends to all attributes germane to fitness for office regardless of whether those attributes double as the official's private

character. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Characteristics that impact an official's private character, such as sexual immorality, honesty, malfeasance, or improper motivation, impact the official's public service and concern the public. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

Scandals involving the Catholic clergy are matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). Evangelists such as Micahn Carter, who reach hundreds through media, embrace similar characteristics to office holders and Catholic clergy. The public possesses an interest in the pastor's fitness to serve the Lord and a congregation. Thus, sexual scandals of an evangelist should be a subject of public concern. Although more famous than Micahn Carter, scandals involving televangelists Jimmy Bakker and Jimmy Swaggart readily come to mind.

Courts interpret broadly, in favor of a defamation defendant, the factor of the plaintiff voluntarily entering into the controversy. *Makaeff v. Trump University, LLC*, 715 F.3d 254, 266 (9th Cir. 2013). Voluntariness can be satisfied by a showing that a person engaged in a course of conduct that foreseeably puts himself at risk of public scrutiny with respect to a number, albeit a limited range, of issues. *Makaeff v. Trump University, LLC*, 715 F.3d 254, 266 (9th Cir. 2013). When a citizen exposes himself to the limelight, he may become a public figure. *Exner v. American Medical Association*, 12 Wn. App. 215, 221, 529 P.2d 863 (1974). One may become a public figure by the

notoriety of his achievements or the vigor and success with which he seeks public attention. *Exner v. American Medical Association*, 12 Wn. App. 215, 221 (1974).

Washington decisions emphasize the voluntariness of a private person's notoriety before becoming a public figure. *Camer v. Seattle Post–Intelligencer*, 45 Wn. App. 29, (1986); *Exner v. American Medical Association*, 12 Wn. App. 215, 221 (1974). Private citizens do not become public figures subject to damaging falsehoods concerning their lives without recourse when they are suddenly thrust into the news by events. *Exner v. American Medical Association*, 12 Wn. App. 215, 222 (1974). When chance and the news media bring a private citizen into the public eye, the citizen's right to redress for defamation does not diminish so long as he did not choose this notoriety. *Exner v. American Medical Association*, 12 Wn. App. 215, 222 (1974).

By filing this lawsuit, Micahn Carter draws attention to himself and his sexual contact with Mary Jones. He also did so in his Alabama case. Still a person is not considered a public figure solely because he or she sought relief through the courts or was involved in a newsworthy controversy. *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976); *Demopolis v. Peoples National Bank of Washington*, 59 Wn. App. 105, 109, 796 P.2d 426 (1990); *Camer v. Seattle Post–Intelligencer*, 45 Wn. App. 29, 42 (1986). Even if the State had prosecuted Carter for rape, he would not have necessarily lost private person status despite being a criminal defendant. *Bender v. Seattle*, 99 Wn.2d 582, 600

(1983).  Being a prominent businessman also does not render one a limited public figure.

*Bender v. Seattle*, 99 Wn.2d 582, 600 (1983).

Micahn Carter did not seek public familiarity in the sense that a politician does to gain votes.  He still, however, promoted himself like a performer or politician would.  In addition to allegedly wishing to draw attention to Christ, he also wished to draw attention to himself.  As his complaint confirms, he sought publicity for purposes of paid speaking engagements and books sales.  Religious leaders become celebrities just as politicians do. Religion plays as strong an influence in America as politics.  *The Role of Religion in American Society and Politics*, US REPORTER, (Apr. 14, 2025), https://usreporter.com/the-role-of-religion-in-american-society-and-politics/.  Like politicians, televangelists vie for viewership on various media platforms.

A review of *Clardy v. Cowles Publishing Co.*, 81 Wn. App. 53  (1996) influences our decision to treat Micahn Carter as a limited public figure.  *The Spokesman Review* published a news article mentioning that John Clardy, a participant in a proposed major Spokane housing development, used a fictitious address.  When Clardy complained about the erroneous statement, the newspaper ran a correction.  Thus, the newspaper afforded Clardy access to the media.

John Clardy held a financial interest in the Mission Springs development project. Clardy served as an officer in the development company.  He signed United States Department of Housing and Urban Development (HUD) documents on behalf of the

company to obtain insurance for financing the project, and he met with HUD officials.

This court concluded that these actions alone did not render Clardy a limited public

figure. Clardy voluntarily inserted himself into the Mission Springs development and the

controversy surrounding the development when he contacted two state legislators, the

Governor, the director of the Department of Ecology, and the head of personnel at

Eastern Washington University. Still, this court concluded Clardy did not thrust himself

into the vortex of the controversy, by these additional steps, because he tried to move

government employees to action, not influence public opinion. Nevertheless, Clardy

thrust himself into the controversy and into being a limited public figure when he sent

letters to residents in the Mission Springs area telling the "new neighbors" about the

Mission Springs project and advising them he would update them on the development's

progress. These actions attempted to influence public sentiment and resolution of the

controversy created by the development.

The Spokane newspaper's July 1993 article focused on John Clardy's conviction

for tax evasion and his current involvement in the Mission Springs project to develop an

apartment and townhouse complex with loans guaranteed by the Department of Housing

and Urban Development. The article reported that Clardy attempted to evict 400 families

from rental homes in California in 1972. The article also quoted Clardy as denying an

ownership interest in the corporation developing the site. By the time of publication of

the article, controversy surrounded the project. The proposed project engendered

neighborhood protests. The newspaper article's discussion of John Clardy as one person involved in the development, management of residential housing, and government guaranteed financing bore relevance to the controversy. The controversy existed before the newspaper published its story. The controversy remained active at the time of the publication of the story. This court affirmed summary judgment dismissal of the defamation suit because the paper did not, with reckless disregard for the truth, publish the erroneous statement about the use of a fictitious address.

One could argue against Micahn Carter becoming a limited public figure because the controversy stemming from Mary Jones' reporting of his misconduct only implicates a church in the town of Yakima. Nevertheless, *Clardy v. Cowles Publishing Co.* entailed a controversy involving only a Spokane neighborhood. This court deemed John Clardy a limited public figure for purposes of defamation law as to a housing development in that neighborhood.

Anyway, Micahn Carter's controversy did not simply involve an isolated church in insulated Yakima. The Together Church belonged to the Association of Related Churches, a nationwide organization of evangelical churches. After the encounter with Mary Jones, other members of ARC worked to "rehabilitate" Carter. Within one year, Carter preached at an affiliate church in Birmingham, Alabama. Carter thrust himself into a large pulpit and with vigor sought the limelight through books and speaking engagements. He abandoned any anonymity.

Mary Jones' sexual encounter with Micahn Carter entails a broader controversy than contact between Carter and Jones. Regardless of whether the sex was consensual, Pastor Carter engaged his employee and parishioner in sex at the church facility. The "Me Too Movement" brought to the forefront of American society the unethical and abusive practice of male leaders and employers withholding career advancement from women unless they submitted to sexual demands, turning professional support into predatory transactions.

In describing the size of Micahn Carter's fame, Mary Jones cites three webpages that she asserts show that Carter led a church with thousands of members, accumulated a huge online following, and established himself as an author and public speaker. We have already ruled we will not consider the pages. The parties otherwise supply us with few facts as to the size of the Together Church. We know, however, that Micahn Carter already had a large audience devoted to him before the controversy.

We have limited glimpses into Carter's status as a public figure. In his verified complaint, Micahn Carter alleged that the defamation caused loss of reputation, cancellation of paid speaking engagements, and the decrease in book sales. The book covered Christian values. The engagements concerned evangelistic efforts. Carter traveled for speaking engagements, including one trip to Alabama the day after the sexual encounter. Carter served as lead pastor at a church with at least three assistant pastors.

The church engaged in evangelical efforts and aligned with other similar churches. He readily found another pulpit at a similar church in Birmingham, Alabama.

In short, our controversy narrowly entails whether Micahn Carter raped Mary Jones. Nevertheless, the controversy expands broader because of the publicly important subject of a pastor using his position to gain sexual favors from an assistant and current nationwide crisis of sexual harassment in the workplace.

In early June 2019, Micahn Carter announced, during a Together Church service, his resignation from the church. Carter told the congregation he engaged in "'an inappropriate incident'" about which he was "'not proud.'" He had "'made a wrong decision.'" CP at 97. Carter explained that a doctor, who he visited, diagnosed him with a mental condition that caused him to say and do things inconsistent with this character. Carter declared that he had no intention of preaching again.

By his resignation speech before his congregation, Carter voluntarily entered the controversy surrounding his conduct. He sought to minimize his conduct, regardless of whether the sex was nonconsensual, by calling his sin "'an inappropriate incident.'" CP at 97. He uttered a false confession, by blaming his action on a mental condition. He sought sympathy by referencing his doctor's diagnosis. By the time of the resignation, gossip had circulated among the Together Church parishioners. The Together Church never presented Mary Jones an opportunity to tell her version of the story from the pulpit.

Micahn Carter continues to enjoy a speaking platform. Jones has none. Mary Jones did not pen her letter or write her blog post until Carter returned to the pulpit.

Although Micahn Carter did not become a public figure merely by suing Mary Jones, the aggressive nature of his suits in Alabama and Washington State illustrate his strong desire to uphold his public standing as an effective evangelist and a man of God. He desires to be a successful and known public figure. Instead of forgiving someone who purportedly falsely accused him, he catapults muck at Jones by trying to publicize, in the court file, her former questionable sexual activity. His attacks on Jones echo measures employed by public officials and famous personages in order to belittle someone with whom he engaged in sex, consensual or nonconsensual, and in order to retain his public standing. Bill Clinton publicly belittled and lied about Monica Lewinsky. Donald Trump defamed Jean Carrol and denigrated Stormy Daniels. Jimmy Bakker described church secretary Jessica Hahn as a sexual predator who seduced him.

The public concern attended to the case's controversy bolsters a conclusion that Micahn Carter rose to becoming a limited public figure. Society possesses a legitimate concern in pastor's extramarital affairs. Steven Koster, *Why Pastors Have Affairs: Sacred Boundaries and Sexual Abuse*, FAM. FIRE (Nov. 1, 2023), https://familyfire.com/articles/why-pastors-have-affairs. Affairs of pastors demean the Christian message, shake the faith of believers, disband churches, and ruin lives.

*The Fall of Shepherds: When Pastors' Sins Come to Light*, CHURCH VITALITY NETWORK, https://thechurchvitalitynetwork.com/blog/pastorsins.

We review some foreign decisions that analyze whether a defamation plaintiff qualified as a limited public figure. In *Gottwald v. Sebert*, 40 N.Y.3d 240, 220 N.E.3d 621, 197 N.Y.S.3d 694 (2023), music producer Lukasz Gottwald sued singer and songwriter Kesha Rose Sebert after she alleged that he raped her after she signed a contract with Gottwald to produce an album. The court ruled Gottwald to be a limited public figure who must prove by clear and convincing evidence that Sebert acted with actual malice. Gottwald advertised himself as an acclaimed music producer.

*Cottrell v. Smith*, 299 Ga. 517, 788 S.E.2d 772 (2016), involves an evangelist seeking recourse for broadcasting of stories involving sexual dalliances. Stan Cottrell, a preacher and motivational speaker, brought action against bloggers for defamation, invasion of privacy, and intentional infliction of emotional distress. The trial court vacated verdicts granted in favor of Cottrell. The appeals court affirmed.

Stan Cottrell ran long distances in foreign countries to draw attention to the Christian God. In addition to his speaking engagements in the United States, he engaged in entrepreneurial adventures. He sued bloggers that included former planners of motivational presentations, a long-term friend who knew women with whom Cottrell engaged in extramarital affairs, and one woman with whom he had an affair. The blog posts questioned the authenticity and integrity of Cottrell's claims and achievements.

One blog portrayed Cottrell as having a long history of misrepresentation and deception for personal gain.

The Georgia trial court held, despite the jury verdict, that Stan Cottrell was a limited public figure. The trial court also ruled that Cottrell failed to establish with clear and convincing evidence that the bloggers published their statements in reckless disregard to the truth. The Georgia reviewing court agreed with both rulings. The appeals court also rejected Cottrell's argument that the subject matter of the blogs bore no relationship to the factors that rendered him a public figure. The court held that any information about one's morals and character related to his standing as a Christian evangelist.

In *Faltas v. State Newspaper*, 928 F. Supp. 637 (D. S.C. 1996), *aff'd,* 155 F.3d 557 (4th Cir. 1998), the court noted that a plaintiff retained a limited-purpose public figure status when she accepted speaking engagements at the time the defendant published statements. Mary Jones wrote her statements of rape while Micahn Carter engaged in public evangelism.

In *Fredin v. Middlecamp*, 500 F. Supp. 3d 752 (D. Minn. 2020), *aff'd,* 855 Fed. Appx. 314 (8th Cir. 2021), Lindsey Middlecamp shared with others a public social media post from an individual who alleged Brock Fredin raped her. The United States district court summarily dismissed Fredin's defamation lawsuit. In so ruling, the district court deemed the subjects of sexual harassment, rape, and a woman speaking about her

experience with rape to be topics of public concern. The court deemed the speech to be of public concern despite being presented on a twitter account rather than by a traditional news entity.

We do not wish to ignore the presence of foreign decisions that adopt arguments raised by Micahn Carter as to his status as a public figure. For example, in *Grenier v. Taylor*, 234 Cal. App. 4th 471, 183 Cal. Rptr. 3d 867 (2015), Bob Grenier sued his son Alex for defamation after Alex created a website on which he claimed his father molested him as a boy. Bob pastored a church with a membership of 400 adults. Bob wrote a book entitled, *A Common Miracle*, in which he wrote about his conversion to Christ. One could download the book for free on the Internet. *Grenier v. Taylor*, 234 Cal. App. 4th 471, 476 (2015). Bob operated a local religious radio program. On his website, Alex also claimed his father stole money from the church.

On appeal, the California reviewing court rejected Bob Grenier being a limited public figure. According to the court, Bob's thrusting himself into the public eye as an expert on the Bible and its teachings did not alone metamorphize him into a limited purpose public figure in the context of this case. Bob's self-promotion as a spiritual leader guiding others on Christian morals did not open him up to public comment on private conduct. Holding a member of the clergy a limited purpose public figure on any issue relating to morality simply because of his or her profession would render a member

of the clergy an all-purpose public figure. The pastor must have voluntarily acted to influence the resolution of a discrete public controversy.

Many distinguishing features distance Micahn Carter's lawsuit from Bob Grenier's suit. Carter, unlike Grenier, publicly spoke about his dalliance before the church body at a time when the congregation gossiped about his conduct. Carter attempted to blame the encounter on a medical condition. Grenier's alleged molestation of his son occurred in the privacy of the home. Micahn Carter's behavior occurred in the church building with a church employee.

Although the California court determined that Bob Grenier was not a public figure, it nevertheless held, in *Grenier v. Taylor*, that Greiner's conduct implicated a matter of public interest within the community when ruling on his son Alex's motion to dismiss under the California Act Limiting Strategic Lawsuits Against Public Participation (SLAPP). Cal. Civ. Proc. Code § 425.16. The church congregation was sufficiently large to constitute a relevant community. Allegations of theft of church funds impacted church members who donated to the church. As pastor of the church, Bob was the members' spiritual and moral leader. As such, allegations regarding Bob's character and fitness to serve as a pastor were of interest to the membership. Accusations of abuse by members of the clergy concern issues of public interest.

*Issue 8: Was Mary Jones' accusation of rape one of opinion rather than fact?*

*Answer 8: Yes, but only as to the blog.*

Mary Jones contends Micahn Carter's defamation action fails as a matter of law based on her accusation of rape being a matter of opinion, not facts. Contrarily, Micahn Carter insists that an accusation of rape is always one of fact, not opinion. After an analysis of the law's distinction between fact and opinion, the character of Jones' publication, the trust nature of the relationship between Carter and Jones, and the inner thoughts of the parties influencing whether rape occurred, we agree with Jones as to her assertion of rape in her blog post, but not the Hodges letter.

Resolution of whether a statement is one of fact or opinion presents a question of law, properly and preferably decided by the court on summary judgment. *Benjamin v. Cowles Publishing Company*, 37 Wn. App. 916, 922, 684 P.2d 739 (1984); *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 256 (1991). The defamation plaintiff bears the burden to show the challenged statement is fact, not protected opinion. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000).

English-American defamation law has always distinguished between fact and opinion. W. Page Keeton, *Defamation and Freedom of the Press*, 54 TEX. L. REV. 1221, 1240 (1976). The constitution protects opinions. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993). According to the United States Supreme Court, the First Amendment recognizes no such thing as a false idea. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). No matter the perniciousness of an opinion, we depend for its correction not on the conscience of judges and juries but

on the competition of other ideas. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40

(1974). The protection afforded opinions extends to a statement of opinion about private

matters. *Benjamin v. Cowles Publishing Company*, 37 Wn. App. 916, 684 P.2d 739

(1984).

Despite the age-old distinction between fact and opinion in defamation law, the

Washington Supreme Court directs lower courts to ignore the dichotomy between fact

and opinion and instead distinguish between statements that are actionable and those that

are not actionable. *Dunlap v. Wayne*, 105 Wn.2d 529, 538-39 (1986). This direction

from the court may be nonsensical because, when distinguishing between actionable and

nonactionable communications, the court must still determine whether an ostensible

opinion impliedly references false facts. Washington law employs the same factors other

courts utilize when distinguishing between fact and opinion, not actionable and

nonactionable statements.

The Washington Supreme Court directs a lower court to consider at least three

factors when assessing whether the subject communication constitutes nonactionable

opinion or actionable facts. A court should consider at least (1) the medium and context

in which defendant published the statement, (2) the audience to whom it was published,

and (3) whether the statement implies undisclosed facts. *Dunlap v. Wayne*, 105 Wn.2d

529, 539 (1986). As to the first element, the nature of the medium and the setting to the

communication can affect whether the listener receives a statement as fact or opinion.

The listener generally deems statements of opinion to be found in certain contexts, such as editorial pages or political debates. *Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986). The court should consider whether the speaker qualified the defamatory statement with cautionary "terms of apparency." *Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986). The court should also consider the entire article and not merely a particular phrase or sentence. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 39-40 (1986). A hyper technical parsing of a possible fact from its plain context of opinion imperils the cherished constitutional guarantee of free speech. *Immuno AG. v. J. Moor-Jankowski*, 77 N.Y.2d 235, 256 (1991).

The more the writer presents to the reader the background of the controversy, particularly the writer's subjective experience, the less likely the court will permit liability. *Gross v. New York Times Company*, 82 N.Y.2d 146, 153-54 (1993). Such writing allows the reader to decide for himself or herself whether to take sides in the controversy and what side to take. *Gross v. New York Times Company*, 82 N.Y.2d 146, 153-54 (1993).

The second factor recognizes the audience of the communication as important. *Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986). Paramount are audience expectations. *Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986). In the context of ongoing public debates, the audience anticipates mischaracterizations and exaggerations and likely views representations with an awareness of the subjective biases of the speaker. *Dunlap v.*

*Wayne*, 105 Wn.2d 529, 539 (1986). The court should thus consider whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole. *Dunlap v. Wayne*, 105 Wn.2d 529, 539 (1986).

The third and perhaps most crucial factor to consider in the first test is whether the statement of opinion implies that undisclosed facts support it. *Dunlap v. Wayne*, 105 Wn.2d 529, 540 (1986). Under Washington law, statements of "pure" opinion are nonactionable. *Dunlap v. Wayne*, 105 Wn.2d 529, 538 (1986). Nevertheless, the law may consider a statement in the form of an opinion to be actionable if the communication implies defamatory facts as the basis for the opinion. RESTATEMENT (SECOND) OF TORTS § 566. If a direct statement would defame the plaintiff, a statement of an opinion implying the existence of those false facts supports a defamation action. *Valdez-Zontek v. Eastmont School District*, 154 Wn. App. 147, 158 (2010). Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves. *Dunlap v. Wayne*, 105 Wn.2d 529, 540 (1986).

The ordinary reader of Mary Jones' blog post may consider her accusation of rape to be a private indictment of a crime. Some decisions hold that the constitution does not protect false accusations of criminal activity, even in the form of opinion. *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675, 683 (1986). The law discriminates between opinions that attribute improper motives to a public figure from accusations that an

individual committed a crime or is dishonest. *Ollman v. Evans*, 750 F.2d 970, 980 (D.C.1984); *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 63 (2d Cir.1980); *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 382, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977). Other courts have deemed assertions of blackmail, fraud, extortion, bribery, or corruption to be, in certain contexts, nonactionable rhetorical hyperbole. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 155 (1993); *Melius v. Glacken*, 94 A.D.3d 959, 961, 943 N.Y.S.2d 134 (2012).

We counterbalance the principle that charges of a crime constitute actionable fact with another rule that pertains to Mary Jones' assertion of rape. An allegation that implicates subjective evaluations of intent and state of mind lack suitability for a defamation claim. *Coleman v. Grand*, 523 F. Supp. 3d 244, 262 (E.D. N.Y. 2021). Intent and state of mind inherently are matters not readily verifiable and not subject to factual proof. *Coleman v. Grand*, 523 F. Supp. 3d 244, 262 (E.D. N.Y. 2021).

For example, in *Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D. N.Y. 2021), Steven Coleman sued Maria Grand for defamation. Grand wrote that Coleman persuaded Grand to engage in sex with him. Coleman insisted that Grand pursued him for sex in order to advance her career. The court held that Coleman could not sustain an action for defamation because his story and Grand's story differed in regard to the parties' motivation for sex.

We now analyze the statements issued by Mary Jones in light of the circumstances in which she wrote them. We follow the process and factors outlined in *Dunlap v. Wayne*, 105 Wn.2d 529 (1986) and *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29 (1986).

Micahn Carter complains about a July 21, 2021, blog posted by Mary Jones. In the post, Jones did not speak with caution or qualify her accusation of rape with any statement implying apparency or equivocality. She did not detail the penetration that occurred. This factor weighs against her communication as an opinion. Nevertheless, most other factors counterpoise in favor of her blog post being that of an opinion.

The law directs us to consider the medium employed and the intended audience. Mary Jones posted her blog on the platform Medium that allows writers and bloggers to share their ideas and stories with a wide audience. We do not know the identity of anyone who may have read the post. We still weigh this factor in favor of Jones. The average reader understands communications on platforms such as Medium to contain subjective views of the writer and the writing is often subject to exaggerations. Morgan McSweeney (aka Dr. Noc), *How We've Become 'Chained to Exaggeration*,' MOVIE GUIDE, (Mar. 11, 2025), https://www.movieguide.org/news-articles/how-weve-become-chained-to-exaggeration.html.

In her July 21, 2021, blog post, Mary Jones did more than accuse Micahn Carter of raping her. She provided detailed facts of Carter's grooming her in the preceding

months.  She narrated that Carter talked about her exuding sexuality and his dreaming of her.  She wrote that Carter, on another day, grabbed her bottom, after which he sobbed in sorrow.  Between the two TLC meetings, he aggressively embraced her.  He then apologized and asked Jones if she would act weird.  Jones described her thinking, during this time, of being uncomfortable from the advances of Carter.

Mary Jones wrote further in her blog post that, after she returned from the second TLC meeting, she entered her office.  Carter aggressively and unstably grabbed her.  Jones first froze.  Then she waved her hands and pivoted around.  She told Carter: "'Please don't do this, you'll regret this.'"  CP at 50.  Carter turned Jones back around, while Jones placed the bottom of a foot against the door.  Jones glanced at her shoes and noticed a stain on the shoe's suede.  She heard the sound of Carter's belt buckle and thought "it was over."  CP at 50.  The detail depicted assisted the reader to judge whether rape occurred.

Mary Jones wrote in the first person as the victim of the rape.  The blog post is not the statement of a third party dispassionately relating facts.  A reader can then choose to read with caution.

Micahn Carter's versions of the facts confuse us.  Within weeks of the sexual encounter, Micahn and April Carter told Pastor Kevin Gerard that Micahn could not remember the sexual encounter.  If he cannot remember the event, we do not know how he can deny that he raped Mary Jones, let alone testify that Jones consented to the sexual

79

encounter. Within two months of the encounter, Carter told his congregation that his physician diagnosed him with a mental condition that caused him to say and do things inconsistent with his character. Presumably acts inconsistent with his character would embrace sexual intercourse with a woman without gaining her consent.

Micahn Carter, contrary to his earlier denial of not remembering the encounter, testified in a declaration for this suit that Mary Jones hugged Carter. The hug lingered, and Jones pressed her body against Carter's body. Jones positioned herself in front of and blocked a door. The bodily contact escalated and led to sexual intercourse. He did not testify that Jones initiated intercourse. His declaration did not state that Jones expressed consent. He did not deny that Jones stated: "'Please don't do this.'" CP at 50.

Mary Jones wrote her July 21, 2021, blog post not simply to relate a rape against her. The post described her Christian experience, longing for belonging, need for assistance, need for a church, trust in a pastor, being a single mom, the shame of sin, a struggle with sexuality, grooming by a pastor, false penitence by someone wronging her, assuming responsibility for her actions, rehabilitation, healing, and constant clutching of Jesus and Christ's church. She only described the rape in this context. The reader readily recognized she suffered hurt, betrayal, and shame regardless of whether the encounter was consensual. The reader could draw conclusions as to the accuracy of portions of her story. Micahn Carter does not dispute any of the underlying facts Jones placed in the blog.

In her blog post, Mary Jones did not claim that the State prosecuted or convicted Michan Carter for rape. She did not reference any definition of rape or any statute creating rape as a criminal offense.

In addition to avoiding the entirety of the blog post written by Mary Jones, Micahn Carter circumvented in his declaration the circumstances in the months preceding the sexual encounter. Carter told Jones in advance that she exuded sexuality and about his dreams of her. He cleverly scolded Jones for not being able to resist a then hypothetical sexual advance from him because of his magnetism.

Mary Jones' blog post informed the reader that Micahn Carter employed Jones as his assistant and functioned as her pastor. The reader knew that Carter held the power to fire Jones from a job she had enjoyed. Also, Carter was Jones' pastor and trusted father figure. This background contributed to the statement of rape being one of opinion.

In her letter to Chris Hodges, Mary Jones succinctly wrote that Pastor Micahn Carter raped her. She provided no underlying details. Thus, we adjudge the letter's accusation of rape to be actionable fact, not nonactionable opinion.

*Issue 9: Did Micahn Carter raise an issue of material fact as to whether Mary Jones communicated a false statement knowing the statement to be false or in reckless disregard of the statement?*

*Answer 9: No.*

Because we rule that Mary Jones' report of rape in her blog post constitutes an opinion, we need not, to grant her summary judgment regarding the blog, decide whether Jones knew the allegation of rape to be false or she heedlessly claimed rape in disregard of the truth. Nevertheless, because of the importance of this decision and because of potential review by a higher court, we proceed to determine whether Micahn Carter presents a question of fact as to actual malice behind the blog post. We must anyway determine whether the undisputed facts show actual malice of Mary Jones when sending the letter to Chris Hodges because the letter's charge of rape receives no shield as an opinion. The Hodges letter merits a partial shield of actual malice because of the common interest privilege.

The question of actual malice entails two sub issues. First, was Mary Jones' accusation of rape false? An essential element in a defamation action is proof of falsity. *Mark v. Seattle Times*, 96 Wn.2d 473, 482 (1981). Second, assuming Jones' use of the word "rape" was untrue, did she use the word knowing it to be false or in reckless disregard to the truth. These two issues run slightly perpendicular, but mainly parallel to one another. So, we analyze them concurrently. The two questions also bleed into the question we already decided — whether Jones' allegation of rape constituted one of fact or opinion.

If the common interest privilege applies or if the defamation claimant qualifies as a public figure, the claimant must show the speaker acted with actual knowledge of the

falsity or that she acted with reckless disregard as to the truth or falsity of the story, the actual malice standard. *Herron v. KING Broadcasting Company*, 112 Wn.2d 762, 775, 776 P.2d 98 (1989), *holding modified by Richmond v. Thompson*, 130 Wn.2d 368, 922 P.2d 1343 (1996). In addition to this heightened level of fault, a public figure plaintiff must meet a heightened burden of proof. In order to show fault, a plaintiff must prove by "clear and convincing evidence" actual malice. *Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371, 387-88 (2002). In contrast, under the negligence standard, a plaintiff need only prove by a preponderance of the evidence that the defendant knew or, in the exercise of reasonable care, should have known that the statement was false or would create a false impression in some material respect. *Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371, 387-88 (2002).

Actual malice is a subjective test. *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 924 (9th Cir. 2022). The test requires evidence that the speaker was plagued with serious doubts as to the truth of the statement. *Herron v. KING Broadcasting Co.*, 112 Wn.2d 762, 775 (1989). The defendant must hold subjective awareness of probable falsity. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968). Mere failures to investigate or mistakes made in an investigation leading to a news story will not prove recklessness. *Herron v. KING Broadcasting Company*, 112 Wn.2d 762, 775 (1989). The court may not measure reckless disregard by what a reasonably prudent

woman would have done under similar circumstances. *Cottrell v. Smith*, 299 Ga. 517, 526 (2016).

Actual malice in a constitutional sense is not spite, ill will, or hatred. *Atlanta Humane Society v. Mills*, 274 Ga. App. 159, 165, 618 S.E.2d 18 (2005). Actual or constitutional malice differs from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. *Atlanta Humane Society v. Mills*, 274 Ga. App. 159, 165 (2005).

When assessing the truth or falsity of a communication, the words uttered by the broadcaster should be construed in the sense in which the ordinary person would understand them in their context. *Amsbury v. Cowles Publishing Company*, 76 Wn.2d 733, 458 P.2d 882 (1969); *Jha v. Khan*, 24 Wn. App. 2d 377, 392, 520 P.3d 470 (2022); *Exner v. American Medical Association*, 12 Wn. App. 215, 217 (1974). A defamation defendant need not establish the literal truth of every claimed defamatory statement. *Mark v. Seattle Times*, 96 Wn.2d 473, 493 (1981). A defendant avoids liability when the statement is substantially true or the gist of the story, the portion that carries the "sting," is true. *Mark v. Seattle Times*, 96 Wn.2d 473, 494 (1981).

A federal court of appeals affirmed a trial court's dismissal of a defamation claim because the broadcasted message, about which the plaintiff sued, could only be reasonably understood as true or substantially true. *Carroll v. Trump*, 685 F. Supp. 3d 267, 274 (S.D. N.Y. 2023), *aff'd in part,* 88 F.4th 418 (2d Cir. 2023). A statement is

substantially true if the statement, if corrected to convey the precise truth, would continue to have a similar effect on the mind of the reader. *Carroll v. Trump*, 685 F. Supp. 3d 267, 274 (S.D. N.Y. 2023), *aff'd in part,* 88 F.4th 418 (2d Cir. 2023). The defamation suit fails if the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel. *Carroll v. Trump*, 685 F. Supp. 3d 267, 274 (S.D. N.Y. 2023), *aff'd in part,* 88 F.4th 418 (2d Cir. 2023).

Whether or not Mary Jones knew she told a falsehood or she recklessly disregarded the truth lies particularly within her mind. For this reason, much of summary judgment jurisprudence dictates that we deny summary judgment in her favor. All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Casualty Company*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972). The reviewing body may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact. *TracFone, Inc. v. City of Renton*, 30 Wn. App. 2d 870, 876, 547 P.3d 902 (2024). When essential information exists exclusively within the knowledge of one of the parties, the law generally imposes the burden on the party possessed of that knowledge to make the proof. *Cedar River Water & Sewer District v. King County*, 178 Wn.2d 763, 779, 315 P.3d 1065 (2013). We reluctantly grant summary judgment when material facts are particularly within the knowledge of the moving party. *Riley v. Andres*, 107 Wash. App.

391, 395, 27 P.3d 618 (2001). In such cases, the matter should proceed to trial in order that the opponent may be allowed to disprove such facts by cross-examination and by the demeanor of the moving party while testifying. *Arnold v. Saberhagen Holdings, Inc.*, 157 Wn. App. 649, 662, 240 P.3d 162 (2010).

Summary judgment may be inappropriate for determinations based on subjective facts of motive, intent, good faith, knowledge, or malice. *McFarland v. Tompkins*, 34 Wn. App. 2d 280, 319, 567 P.3d 1128 (2025). A party's knowledge, like other state of mind inquiries, is elusive and rarely is established by other than circumstantial evidence. *McFarland v. Tompkins*, 34 Wn. App. 2d 280, 319 (2025). Self-serving affidavits raise questions of credibility for the finder of fact, not the court, to resolve. *McFarland v. Tompkins*, 34 Wn. App. 2d 280, 319 (2025).

Based on these principles, this court could summarily conclude that a question of fact exists as to whether Mary Jones knowingly falsely accused Micahn Carter of rape or issued the indictment in disregarded for the truth even though she denies this. But in all defamation cases, the plaintiff, to defeat summary judgment, could simply state that the defendant lied when denying actual malice. As we earlier wrote, in order to protect free speech rights, defamation law requires something more to defeat a summary judgment motion.

The standard of actual malice is daunting. *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). The standard of proof of actual malice runs extremely

high. *Cottrell v. Smith*, 299 Ga. 517, 525 (2016). The clear and convincing standard of proof applies, even at the summary judgment stage. *Herron v. KING Broadcasting Company*, 112 Wn.2d 762, 775-76 (1989). Because of the heightened burden imposed by the clear and convincing standard and the challenges associated with offering evidence about state of mind, the defamation plaintiff cannot easily reach the malice standard, even at summary judgment. *Jankovic v. International Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016). Few public figures have clearly and convincingly proved someone, with serious doubts as to the truth of the statement, uttered a scurrilous charge about him. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Jankovic v. International Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016).

Actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith. *Jankovic v. International Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016). Nor does it suffice for a plaintiff merely to proffer purportedly credible evidence that contradicts a defendant's story. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003). Showing ill will toward the plaintiff or bad motives do not support a finding of actual malice. *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987). Importantly, the question whether the evidence in the record in a defamation case suffices to support a finding of actual malice is a question of law. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990).

Despite the liberal principles benefiting the defamation defendant when reviewing

actual malice, a court must still deny a summary judgment motion under some

circumstances. Actual malice may be inferred from objective facts, and evidence of

negligence, motive and intent, by cumulation and appropriate inferences, may establish

the defendant's recklessness or knowledge of falsity. *Vern Sims Ford, Inc. v. Hagel*,

42 Wn. App. 675, 681 (1986). The defendant's mere statement of her belief in the

publication's truth must be weighed against evidence adduced that supports a finding of

knowing falsity or recklessness. *Rye v. Seattle Times Company*, 37 Wn. App. 45, 53-56,

678 P.2d 1282 (1984); *Reader's Digest Association v. Superior Court*, 37 Cal.3d 244,

208 Cal.Rptr. 137, 144-46, 690 P.2d 610 (1984). In assessing the defendant's subjective

doubts as to the publication's truth, a court typically will infer actual malice from

objective facts. *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 183 (2d Cir.

2000). These facts may include the defendant's own actions or statements, the dubious

nature of her sources, and the inherent improbability of the story. *Celle v. Filipino

Reporter Enterprises Inc.*, 209 F.3d 163, 183 (2d Cir. 2000); *Liberty Lobby, Inc. v. Dow

Jones & Co.*, 838 F.2d 1287, 1293, 267 U.S. App. 337 (D.C. Cir. 1988).

Declarations from Micahn Carter, Kierstin Platt, and Christina Vickers depict the

sexual encounter with Jones as consensual, followed by her regret and later fabrication.

We conclude, however, that when reviewing the entirety of the evidence, the employer-

employee relationship between Carter and Jones, and the pastor-parishioner relationship

between the two, no question of fact exists as to Mary Jones' reckless disregard of the truth. No circumstantial evidence suggests that, by 2021, when Jones sent the Chris Hodges letter and posted the blog, she suffered any doubt as to the truth of her words. Instead, the law considers her statement, because of the unique circumstances, to be true.

The change in Mary Jones' story, from the days after the sexual encounter to when she broadcasted the communications, reflects a common occurrence among women subjected to sexual harassment from an employer. Micahn Carter was Mary Jones' employer. Victims sometimes first blame themselves. Later after therapy, such victims understand the difference in power between the employer and them. With this understanding, victims understand the conduct of the employers to be similar to rape, if not rape itself. Jennie Steinberg, *Why Sexual Assault Survivors Blame Themselves*, THROUGH THE WOODS THERAPY CTR., https://www.throughthewoodstherapy.com/sexual-assault-survivors-blame/ (last visited Oct. 30, 2025).

Despite aligning with Micahn Carter, Kierstin Platt testified to her excitement when Mary Jones underwent treatment because Jones could get answers. Those answers would explain why the sexual encounter occurred and whether Jones held blame. Later, when Jones received answers from the therapists, Platt did not like the answers and discounted the therapists' branding of Carter's conduct as rape.

In her declaration, Kierstin Platt also mentioned that the therapists, by the time Mary Jones entered treatment, knew the story of the sexual encounter between Michan

Carter and Jones since Carter earlier received treatment at the same place. Despite having heard Carter's side of the story, the therapists told Jones she should press charges for rape.

Kierstin Platt and Christina Vickers declared that professionals repeatedly advised Mary Jones that Micahn Carter raped her. Carter does not argue that Jones should disagree with the professionals, some of whom the Together Church enlisted for Jones. Mary Jones' mother immediately and repeatedly told Jones that Carter raped her. Jones' brother and sister also readily characterized the sexual encounter as rape.

Mary Jones did not send the letter to Pastor Chris Hodges until Pastor Kevin Gerald encouraged Jones to send the letter. This encouragement occurred after Jones' counseling. Mary Jones did not write her therapeutic blog post until she sent the Hodges letter.

We repeat earlier observations. While Michan Carter denies raping Mary Jones, he presents no facts showing that Jones consented to sexual intercourse. At most, Jones pressed her body against Carter while embracing him. Such conduct does not establish consent. Carter does not deny that Jones declared: "'Please don't do this.'" CP at 50.

Michan Carter emphasizes that Mary Jones blocked the door with a foot. She could have blocked the door for any number of reasons, including not wanting to get the pastor of her church and father figure into trouble. No evidence suggests that Carter

asked Jones if she wanted to engage in sex, let alone sexual petting. Carter did not testify that Jones verbally consented to intercourse.

On the night of the encounter, Mary Jones told her mother that Michan Carter engaged in sex with her and she did not desire the sex. Within days, Jones told Pastor Kevin Gerald that she did not wish for the encounter to occur.

When asked by Pastor Kierstin Platt if she told Michan Carter "no," Jones answered that she did not say "no," but she said, "'Please don't do this, you'll regret it.'" CP at 50. This comment is not a statement of consent.

In assessing whether Mary Jones told the truth that Micahn Carter raped her, the court need not find that Carter penetrated her without consent. As the dictionary passage at the outset of this opinion shows, the ordinary meaning of "rape" means more than forcible sexual intercourse. The word also connotes an outrageous violation, despoiling, violation, ravaging, abuse, plundering, desecration, and defilement.

In *Carroll v. Trump*, 685 F. Supp. 3d 267, 274 (S.D.N.Y. 2023), *aff'd in part,* 88 F.4th 418 (2d Cir. 2023), the court concluded that Jean Carroll's statements, during a Cable News Network interview, of rape by Donald Trump were at least substantially true. The only basis for Trump's assertion of falsity was the fact that the jury was not persuaded that Mr. Trump had "raped" her within the meaning of the New York Penal Law—in other words, that the jury did not find that he penetrated her vagina with his

penis. But the verdict showed that Trump raped Carroll digitally rather than with his penis. This fact established the substantial truth of Carroll's "rape" accusations.

We draw from *Carroll v. Trump* at least two propositions. First, for purposes of defamation, a court may consider as true an accusation of rape even if the penal code may not consider the act rape. Second, a court may consider an accusation of rape as the truth, as long as the conduct of the plaintiff has earmarks of rape.

In Washington, third degree rape does not require either an offender's use of physical force or a victim's resistance. RCW 9A.44.060. Rape may occur despite the victim failing to clearly express lack of consent. RCW 9A.44.010(2); 9A.44.060. "'Consent' means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." RCW 9A.44.010(2). Micahn Carter presents evidence of consensual hugging but no evidence that Mary Jones, by word or action, freely agreed to sexual intercourse.

We already discussed that the inequality in status between an employer and employee distorts the employee's free choice to engage in a sexual encounter. The sexual encounter between Mary Jones and Michan Carter holds another compelling circumstance that easily leads one to consider the encounter as nonconsensual and rape. Michan Carter was Mary Jones' pastor and spiritual guide. Jones considered Carter a father figure. A pastor's taking sexual advantage of a parishioner constitutes not only a

violation of the parishioner's body but a violation of a sacred trust. Abuse experts deem that sexual contact between clergy and those under their spiritual authority can never be consensual due to the power differential. Danielle M. McGraw et al., Consequences of Abuse by Religious Authorities: A Review." 25 *TRAUMATOLOGY* 242 (2019).

A parishioner, such as Mary Jones, is particularly vulnerable to sexual advances by her pastor. Rebecca Hopkins, *Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law*," CHRISTIANITY TODAY, (June 10, 2024), https://www.christianitytoday.com/2024/06/clergy-sex-abuse-consent-law-crime./ Sexual conduct between a faith leader and a follower lacks the qualities attendant to a consensual relationship since the pastor may use his spiritual position to identify, groom, and ultimately sexualize a relationship with a person under their care or supervision. Rebecca Hopkins, "Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law," *Christianity Today*, June 10, 2024. A sexualized church member rarely reports the sexual encounter out of shame and guilt. Rebecca Hopkins, "Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law," *Christianity Today*, June 10, 2024. Instead of protecting the parishioner, church leaders accuse the parishioner of ruining the pastor's career. Rebecca Hopkins, "Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law,"

*Christianity Today*, (June 10, 2024), https://www.christianitytoday.com/2024/06/clergy-sex-abuse-consent-law-crime/.

Thirteen states, plus the District of Columbia, classify sex between a pastor and parishioner as a felony sexual assault even if the pastor shows consent. These criminal statutes recognize that a parishioner cannot consent to sexual intercourse with a member of the clergy due to the "coercive power imbalances" in the clergy-parishioner relationship. *State v. Wenthe*, 839 N.W.2d 83, 991 (Minn. 2013). Minnesota criminalizes sexual contact between "a member of the clergy, [when] the complainant was not married to the actor, the complainant met with the actor in private seeking or receiving religious or spiritual advice, aid, or comfort … , and the . . . sexual contact occurred during the course of the meeting or during a period of time when the meetings were ongoing." Minn. Stat. § 609.341(24)(2)(v); § 609.344.

Iowa criminalizes sexual exploitation by a counselor or therapist. I.C.A. § 709.15. The act extends to clergy. In *State v. Edouard*, 854 N.W.2d 421 (2014), the Iowa Supreme Court affirmed a pastor's four convictions for sexual relations with four women of his congregation. Like Micahn Carter, Patrick Edouard preached dynamic sermons, a talent considered attractive by some women. The court rejected Pastor Patrick Edouard's challenge to the constitutionality of the statute as it applied to clergy.

Normally unenlightened Arkansas has a similar felony when a member of the clergy "in a position of trust or authority over the victim . . . uses the position of trust or

authority to engage in sexual intercourse or deviate sexual activity." Ark. Code § 5-14-126(a)(1)(d). The Arkansas Supreme Court sustained the conviction of a preacher under this statute when he sexually assaulted a church secretary in his office. *Talbert v. State*, 367 Ark. 262, 268, 239 S.W.3d 504 (2006). The preacher argued the sex was consensual because he asked for sex and she agreed. But the evidence showed the criminal defendant, as a minister, used his position of trust and authority over his victim to engage in unwanted sexual activity.

Uniform Public Expression Protection Act

*Issue 10: Should Micahn Carter's claim of defamation be dismissed under the UPEPA?*

*Answer 10: Yes.*

In 2020, the Uniform Law Commission drafted the Uniform Public Expression Protection Act (UPEPA), chapter 4.105 RCW, as a means to combat an abusive type of litigation. *See* LAWS OF 2021, ch. 259, § 15. The Washington Legislature enacted UPEPA in 2021. In doing so, Washington became the first state to adopt this uniform act. The UPEPA provides for early adjudication of baseless claims aimed at preventing an individual from exercising the constitutional right of free speech. The UPEPA provides courts with a streamlined process to dismiss meritless suits that chill public speech. *Thurman v. Cowles Co.*, 4 Wn.3d 291, 293 (2025).

The Washington Supreme Court had earlier declared a predecessor anti-SLAPP

statute, RCW 4.24.525, unconstitutional because it established a preliminary procedure

for factual adjudication of claims without a trial and thereby violated the constitutional

provision that guarantees a right to trial by jury. *Davis v. Cox*, 183 Wn.2d 269, 351 P.3d

862 (2015), *abrogated on other grounds by Maytown Sand & Gravel, LLC v. Thurston

County*, 191 Wn.2d 392, 423 P.3d 223 (2018). UPEPA incorporates standards for

adjudication that mirror those utilized for motions to dismiss and summary judgment

motions respectively under Civil Rules 12 and 56.

Pursuant to RCW 4.105.020(2), a section of the UPEPA, a party to a lawsuit may

file a special motion for expedited relief to dismiss any cause of action "to which this

chapter applies" within sixty days of service of the complaint. Chapter 4.105 RCW

applies to any claim asserted against a person based on the person's exercise of the right

of freedom of speech "on a matter of public concern." RCW 4.105.010(2)(c). The

moving party carries the burden to establish that the UPEPA applies to the cause of

action. RCW 4.105.060(1)(a). Once the moving party has satisfied this requirement,

the burden shifts to the responding party to establish that a statutory exception applies.

RCW 4.105.060(1)(b). If the responding party does not demonstrate that an exception

applies, the trial court must dismiss the action if either

> (i) The responding party fails to establish a prima facie case as to
> each essential element of the cause of action; or
> (ii) The moving party establishes that:

        (A) The responding party failed to state a cause of action upon which relief can be granted; or

        (B) There is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

RCW 4.105.060(1). If the moving party prevails on the UPEPA motion, the trial court must award the party its costs, reasonable attorney fees, and reasonable litigation expenses. RCW 4.105.090(1).

The UPEPA dictates that all provisions of the act "be broadly construed and applied to protect the exercise of the right of freedom of speech and of the press, the right to assemble and petition, and the right of association, guaranteed by the United States Constitution or the Washington [S]tate Constitution." RCW 4.105.901. We review a trial court's denial of a UPEPA motion de novo. *Jha v. Khan*, 24 Wn. App. 2d 377 (2022).

When reviewing a trial court's order under the UPEPA motion, we engage in the three-step analysis dictated by RCW 4.105.060(1). *Jha v. Khan*, 24 Wn. App. 2d 377, 388 (2022). First, we determine whether the plaintiff sues the defendant for exercising her right to free speech on a subject of public concern. RCW 4.105.010(2)(c); *Jha v. Khan*, 24 Wn. App. 2d 377 (2022). UPEPA law echoes the law of defamation when assessing a matter of public concern. Courts must determine as a matter of law whether a topic presents a matter of public concern by the content, form, and context of a given statement, as revealed by the whole record. *Jha v. Khan*, 24 Wn. App. 2d 377, 389

(2022). Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). We review the defendant's speech as a whole. *Jha v. Khan*, 24 Wn. App. 2d 377, 389 (2022).

We have already ruled, based on overwhelming authority, that the topic of a sexual encounter between a pastor and his assistant, also a parishioner, in the church office immediately after a church service concerns the community. The superior court also ruled the subject matter was a matter of public concern.

If the defendant meets the threshold of the first step, the court moves to a second step. The burden shifts to the plaintiff to demonstrate a statutory exception that would allow the action to proceed. RCW 4.105.060(1)(b). Micahn Carter forwards no exception. Under the UPEPA's third step, the court must determine whether plaintiff presents a question of fact as to each element of a defamation cause of action. *Jha v. Khan*, 24 Wn. App. 2d 377, 390 (2022).

Both parties agree UPEPA applies and no statutory exemption prevents dismissal. The sole issue is whether Micahn Carter presents prima facie proof of each defamation element based on the blog post. We have already resolved this question to the disfavor of Carter.

UPEPA's purpose and procedure are particularly served here because the strong public policy in favor of disclosing workplace sexual assault. The UPEPA wishes to

protect from lawsuit harassment and liability defendants like Mary Jones for speaking about experiences with sexual assault and workplace sexual harassment.

Following the reporting of sexual assault allegations against Harvey Weinstein in October 2017, the #MeToo movement catapulted into the public's consciousness. *Elliott v. Donegan*, 469 F. Supp. 3d 40, 50-51 (E.D. N.Y. 2020). Americans for the first time engaged in a widespread and difficult conversations about what constitutes inappropriate behavior in professional settings and how to construe consent in sexual relationships between prominent industry players and those seeking opportunities within that industry. *Elliott v. Donegan*, 469 F. Supp. 3d 40, 52 (E.D. N.Y. 2020). A growing movement has also sought to publicize and prevent pastor sexual abuse. Rebecca Hopkins, "Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law," *Christianity Today*, (June 10, 2024), https://www.christianitytoday .com/2024/06/clergy-sex-abuse-consent-law-crime/.

Some pastors take advantage of a trusted position to manipulate young women into sexual encounters. Rebecca Hopkins, "Some Churches Call Clergy Sexual Misconduct an 'Affair.' Survivors Are Fighting to Make It Against the Law," *Christianity Today*, (June 10, 2024), https://www.christianitytoday.com/2024/06/clergy-sex-abuse-consent-law-crime/. UPEPA protects such a young woman when she rightly informs and educates the public of sexual abuse in a pastoral or church setting.

No. 40285-1-III
*Carter v. Jones*

CONCLUSION

We dismiss Micahn Carter's defamation cause of action as a matter of law. In doing so, we grant Mary Jones' motion to dismiss, under the UPEPA, Carter's complaint. We award Jones reasonable attorney fees and costs incurred at both the superior court and the Court of Appeals levels. We direct our court commissioner to determine a reasonable amount for the fees and costs at both levels after the filing of a declaration of fees by Jones' counsel.

_____
Fearing, J.

WE CONCUR:

_____
Cooney, J.

_____
Murphy, J.

100